In re the ESTATE OF Michael Patrick SMITH, et al., Plaintiffs,

and

PEOPLE of the State of Colorado, et al., Plaintiffs in Intervention,

v.

Thomas J. O'HALLORAN, et al., Defendants.

Civ. A. No. 75–M–539.

United States District Court, D. Colorado.

Feb. 8, 1983.

Kathleen Mullen and John R. Holland, Denver, Colo., for plaintiffs.

Dennis J. Sousa and Kristie Hansen, Denver, Colo., for plaintiffs in intervention.

Shalom Brilliant, Stanley Wright and Lewis K. Wise, Dept. of Justice, David

Palmer, Dept. of Health and Human Services, Washington, D.C., Janis E. Chapman, Asst. U.S. Atty., Denver, Colo., for defendants.

MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

This very difficult lawsuit began with a complaint filed on May 16, 1975, by Michael Patrick Smith and Carolyn Finnell, residents of Heritage House Nursing Home, as a civil rights action, seeking remedies under 42 U.S.C. § 1983, for alleged violations of constitutional rights. The action was brought as a class action on behalf of all Medicaid recipients residing in the named nursing home. The defendants were the owners and administrators of that nursing home, Casper Weinberger as Secretary of the Department of Health, Education and Welfare (HEW), and the officers of the Colorado Department of Social Services and the Colorado Department of Health. Plaintiffs asserted that both the federal and state governmental defendants were failing to enforce the United States Constitution, together with federal laws and regulations, resulting in deprivations of basic rights protected by the First, Fifth and Fourteenth Amendments to the United States Constitution.

An amended complaint was filed on May 30, 1975. It extended the class allegations to include all Medicaid recipients residing in nursing homes in the State of Colorado. A second amended complaint was filed on June 5, 1975, naming an additional plaintiff, and adding 28 U.S.C. § 1361 as an additional jurisdictional predicate.

A preliminary injunction hearing concerning conditions at Heritage House was held on June 5, 1975, resulting in a stipulation for the adoption of certain procedures for the protection of some of the claimed constitutional rights.

The federal and state governmental defendants challenged subject matter jurisdiction, and the basic questions were briefed extensively. In the plaintiffs' final brief on the jurisdictional and class certification issues, filed on February 17, 1976, the following summary contention is made on page 7:

Plaintiffs are claiming, in essence, with regard to their first three claims for relief that the federal and state governments are massively failing to discharge their constitutional, statutory, regulation and contract duties to create and implement a comprehensive system of preventive enforcement that is designed to insure compliance by nursing homes with all applicable federal laws guaranteeing provision of high quality medical and psychosocial care in a context of civil liberties to plaintiffs and class members. The reach of the failures of the governmental defendants is state wide, indeed national, with regard to the federal Defendants and the devastating human effects of the government's failures on the human being seeking to form this class action are a national tragedy and a national scandal whose focus for the purposes of this litigation must be limited to nursing homes in the state of Colorado. For proper presentation of their first three claims for relief and for effective relief from the Court, Plaintiffs seek the certification of a state wide class comprised of all Medicaid recipients residing in nursing homes facilities participating in the Medicaid Program.

During a series of status conferences in 1976 and 1977, counsel and the court agreed that resolution of the jurisdictional issues would be deferred, pending an effort to establish a fact-finding methodology for surveying conditions in Colorado nursing homes. A law school dean was appointed to assist counsel in working toward that objective. That effort failed.

On March 16, 1978, the jurisdictional issues came on for hearing. At that time, the plaintiffs and the Colorado governmental defendants stipulated to the dismissal, without prejudice, of the claims against those state defendants. That stipulation included the following two paragraphs:

1. State defendants shall forthwith file a complaint in this action against the United States Department of Health, Ed-

ucation and Welfare and individuals acting in official capacities therefor, seeking a redesign of the federal Medicaid nursing home enforcement system so that the system is premised upon resident assessment. State defendants shall diligently prosecute said action and shall settle said action only with the consent of plaintiffs; provided, however, that State defendants may dismiss said action at any time, and thereupon, plaintiffs' claims for relief against State defendants shall be reinstated as though this motion had never been filed and dismissal had never been entered.

2. If the litigation described in paragraph 1 has not resulted in the implementation of a redesigned federal Medicaid nursing home enforcement system by July 1, 1979, State defendants shall, in consultation with plaintiffs, seek to develop State legislation or regulations which shall provide for an adequate State nursing home enforcement system. State defendants shall thereupon seek funding from any and all possible sources for the implementation of such a system. This agreement shall in no way interfere with the earlier development and implementation of a redesigned State nursing home enforcement system, independent of this litigation.

Pursuant to the stipulation of dismissal, the Colorado Attorney General filed a complaint in intervention on behalf of the people of the State of Colorado, the Colorado Department of Health, the Colorado Board of Health, the Colorado Department of Social Services, and the Colorado Board of Social Services, on April 21, 1978. The first two paragraphs of that complaint in intervention are as follows:

1. The federal system of nursing home regulation and enforcement is a national disgrace. Plaintiffs in intervention, the people of the State of Colorado, the State of Colorado, and its health and social service agencies, bring this action against the Secretary of the United States Department of Health, Education and Welfare, seeking to redesign this system so that it focuses upon resident assessment. Plaintiffs in intervention maintain that this system must assure that residents of nursing homes receive the benefits guaranteed under federal law: the right to actually and continuously receive optimal medical, nursing and psychosocial care, provided in a rehabilitatively supportive, accessible, safe, sanitary, home-like and personalized environment, with protection of residents' civil rights. Plaintiffs in intervention, who are charged with implementing the federal nursing home enforcement system, bring this action on their own behalf, seeking an effective and adequately funded system, and on behalf of the people of the State of Colorado, who are entitled to be assured that the Medicaid and Medicare programs deliver the high quality of nursing home care to which they, as nursing home residents and as citizens and taxpayers, are entitled.

2. Plaintiffs, formerly codefendants in this action with defendant Secretary, filed this Complaint pursuant to their Motion to Dismiss Without Prejudice and Stipulation for Dismissal, filed on March 16, 1978. They seek declaratory and injunctive relief, declaring the Secretary's failure to design an effective nursing home enforcement system to fulfill the mandate of the Social Security Act of 1935 and the constitutional doctrine of intergovernmental immunities and ordering the Secretary to adopt and fund regulations for an effective nursing home enforcement system to guarantee the continuous delivery of the benefits required by federal law.

On April 4, 1978, this court entered an order, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, determining that this action shall proceed as a class action on behalf of all Medicaid recipients residing in Colorado nursing home facilities which are participating in the Medicaid Program, and identifying the following common questions of law and fact:

a. Whether the Defendant Secretary of HEW has a duty under the Social Security Act relative to its Title XIX

Medicaid Provisions to develop and cause states participating in the Medicaid Program to implement a system of nursing home enforcement which assures that Medicaid recipients residing in nursing home facilities certified for Medicaid Program participation are actually, continuously receiving their Medicaid entitlements to optimal medical and psychosocial care in safe, sanitary, rehabilitatively supportive, accessible, personalized environments and in a context of full civil liberties as a condition of such facilities' receipt of Federal and State financial reimbursement from the Medicaid Program, and

b. Whether, assuming the Secretary has such a duty, he has adequately or sufficiently discharged or breached it by the present challenged system of nursing home enforcement which he has promulgated and required the states to implement as a condition of their participation in the Medicaid Program.

After extensive pre-trial developments, this court ordered the separate trials of the claims against the federal defendant and the nursing home defendants. On August 6, 1980, the plaintiffs, plaintiffs in intervention, and federal defendant filed a joint motion for a stay, based upon proposed regulatory revisions issued on July 14, 1980. That joint motion included the following paragraph:

Since from the standpoint of plaintiffs and plaintiffs-in-intervention, the ultimate objective of this litigation is to achieve a change in the survey/certification system directly along the lines now apparently being pursued by the Federal defendant, it makes sense to stay these proceedings and channel their energies into supporting and improving the regulatory proposal which the Department is now considering. However, in joining with the Federal defendant in a request for a stay, plaintiffs and plaintiffs-in-intervention wish the Federal defendant to understand that it is their firm intention to proceed to trial on this matter as expeditiously as possible if the process now commenced which forms the basis

for the Joint Motion for Stay breaks down.

The proposed change in regulations never was adopted. Accordingly, the claims against the federal defendant were presented in a full trial to the court from May 17 to June 4, 1982. Pre-trial and post-trial memoranda were filed.

The testimony presented at trial and the voluminous exhibits introduced into evidence have given this court a complete history of the administration of the Medicaid Act by HEW and, later, the Department of Health and Human Services (HHS) with respect to the state's certification and inspection of nursing homes. For purposes of this opinion, the term "nursing home" includes skilled nursing facilities and intermediate care facilities. Additionally, all further reference to "plaintiffs" includes plaintiffs in intervention.

From the great mass of evidence presented at trial, there are some general findings which can be made with complete certainty. The development of nursing homes as providers for those who are unable to care for themselves because of chronic illness or disability is a relatively recent response to this societal need in the United States. The magnitude of the need has increased with two phenomena: the decline of the multigenerational family unit and the extension of the average life span. While there are a wide variety of causes for the loss of individuals' functional autonomy, consideration of the issues in this case may be aided by identifying four groups of people in need of long-term care: (1) younger persons disabled from injuries sustained in accidents; (2) persons suffering from terminal illnesses; (3) elderly persons who simply "have no place to go"; and (4) elderly persons who are suffering long-term effects from a health crisis, such as a stroke, and who may be expected to recover a fully self-functional status.

Providing appropriate care for these groups and other kinds of patients in a nursing home facility necessarily involves the interplay of multiple forces in the public and private sectors of our social order.

These forces have produced an extraordinarily complex circuitry of laws and regulations functioning under the canopy of the federal legislation known as the Medicaid and Medicare Acts. The Medicare Act establishes a national program of health care for elderly persons who have eligibility under the Social Security system. It is a part of the old age pension plan. Medicaid is an effort by the national government to aid state governments in providing for the welfare of the needy disabled.

The evidentiary record also supports a general finding that all is not well in the nation's nursing homes and that the enormous expenditures of public funds and the earnest efforts of public officials and public employees have not produced an equivalent return in benefits. That failure of expectations has produced frustration and anger among those who are aware of the realities of life in some nursing homes which provide so little service that they could be characterized as orphanages for the aged. A natural reaction to such frustration and anger is to try to find fault by focusing on one actor in the scenario. In this case, the spotlight is on the Secretary of HHS. Simply stated, the plaintiffs' contention is that Medicaid recipients in nursing homes in Colorado are not receiving adequate care because the Secretary has failed to force the state of Colorado to use an appropriate patient care management system to insure the delivery of adequate care.

More specifically, the plaintiffs ask this court to determine that the Medicaid Act and its implementing regulations require that the Secretary of HHS develop and cause all states participating in the Medicaid Program "to implement a patient care focused system of survey/certification enforcement which actually insures as a condition of federal and state reimbursement for such services that Medicaid beneficiaries residing in skilled and intermediate care nursing homes are continuously furnished their entitlements to the appropriate high quality rehabilitative, nursing, psychosocial and mental care necessary to permit them to attain and retain their capabilities for independence and self-care." The plaintiffs further seek a finding that the Secretary has violated the Medicaid Act by failing to develop and implement such a system. To remedy that failure, this court is asked to order that the Secretary of HHS be enjoined and mandated to develop a nursing home enforcement system consistent with the purposes of the Medicaid Act and the Secretary's duty under that Act.

### The Medicaid Act

Deciding whether this court has a remedial role in this difficult social problem requires an analysis of the expressed intent of the United States Congress to determine whether the Secretary's asserted duty actually exists. That is not an easy assignment. The Justices of the Supreme Court of the United States have, themselves, lamented the complexity of the Social Security Act in *Schweiker v. Gray Panthers,* 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981).

Title XIX of the Social Security Act, commonly known as the Medicaid Act and codified at 42 U.S.C. § 1396–1396n, provides funding to enable each state to furnish "necessary medical services" for families with certain dependent children and for aged, blind, or disabled individuals "whose income and resources are insufficient to meet the costs" of those services. 42 U.S.C. § 1396. The payments are made to those states which have submitted, and had approved by the Secretary, state plans for medical assistance meeting all of the requirements set forth in 42 U.S.C. § 1396a(a). Colorado submitted and obtained approval of its plan and thereby became entitled to quarterly payments from appropriated federal funds as reimbursement for prescribed portions of the expenditures made for medical assistance to eligible recipients and certain administrative costs.

The core of the plaintiffs' claim for relief against the Secretary is that the statutory requirements concerning the content of state plans create a correlative entitlement for Medicaid recipients to quality care, and that the Secretary has an enforcement obli-

gation to insure compliance with the approved state plan.

■ Medicaid is not a program for the federal government to provide medical services. It is a system for federal funding of state plans to furnish health care to needy persons through agreements with private and public persons and institutions capable of providing such services. *Harris v. McRae,* 448 U.S. 297, 308–09, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784 (1980). To be approved by the Secretary, a state plan must conform to extensive specific requirements set forth in 42 U.S.C. § 1396a(a). That section requires the participating state to designate a "single State agency" to administer or supervise administration of the plan. 42 U.S.C. § 1396a(a)(5). A separate state agency—either the state health agency or other appropriate state medical agency—must be made responsible for establishing and maintaining health standards for the institutions providing care, *id.* § 1396a(a)(9), and the state plan must include descriptions of the standards and methods the state will use to assure that medical or remedial care services provided to the recipients of medical assistance "are of high quality." *Id.* § 1396a(a)(22).

Sections 1396a(a)(26) and (31) set out specific provisions which a state plan must include, concerning, respectively, skilled nursing facilities and intermediate care facilities. The plan must provide for "a regular program of medical review ... of each patient's need for skilled nursing facility care ..., a written plan of care, and, where applicable, a plan of rehabilitation prior to admission to a skilled nursing facility;" *id.* § 1396a(a)(26)(A), and for inspection by medical review teams of:

> (i) the care being provided in such nursing facilities ... to persons receiving assistance under the State plan, (ii) with respect to each of the patients receiving such care, the adequacy of the services available in particular nursing facilities ... to meet the current health needs and promote the maximum physical well-being of patients receiving care in such facilities ..., (iii) the necessity and desir-

ability of the continued placement of such patients in such nursing facilities ..., and (iv) the feasibility of meeting their health care needs through alternative institutional or noninstitutional services ....

*Id.* § 1396a(a)(26)(B)(i)–(iv). With respect to intermediate care facilities, § 1396a(a)(31) requires that the state plan provide for independent professional review of identical aspects of the care being provided in those facilities.

Section 1396a(a)(28) requires the state plan to provide that any skilled nursing facilities receiving payments under the plan must comply with all the requirements contained in 42 U.S.C. § 1395x(j), which defines "skilled nursing facility" for purposes of the Medicare Act. Section 1395x(j) sets out numerous specific requirements which must be met by skilled nursing facilities in order to be approved under a state plan for Medicare, including that they must meet "such other conditions relating to the health and safety of individuals who are furnished services in such institution[s] or relating to the physical facilities thereof as the Secretary may find necessary ..." *Id.* § 1395x(j)(15).

Under § 1396a(a)(33) a state plan must provide that the appropriate state agency will establish a plan for the review by professional health personnel of the appropriateness and quality of care and services furnished to Medicaid recipients, *id.* § 1396a(a)(33)(A), and that the appropriate state agency will determine on an ongoing basis whether participating institutions meet the requirements for continued participation in the Medicaid program under the state plan. *Id.* § 1396a(a)(33)(B). Congress gave the Secretary additional authority to "look behind" the state's determinations of facility compliance, and independently to determine whether institutions meet the requirements for participation in the state Medicaid plan. *Id.*

Section 1396a(b) provides that the Secretary "shall approve" any plan which fulfills the conditions specified in § 1396a(a), including those described above. The Secre-

tary must reimburse states with approved state plans according to the percentages set out in § 1396b. Section 1396b(g)(3), the "utilization control" provision, mandates that the Secretary reduce the percentage of federal reimbursement if the state fails to show that it has an effective program of control over utilization as defined in that section. If after approving a state plan, the Secretary determines that it has been so changed that it no longer complies with § 1396a(a), or that it complies on paper but not in its actual administration, § 1396c requires him to terminate payments to the state, effectively "disapproving" the plan.

Section 1302 is a general mandate to the Secretary to promulgate rules and regulations necessary to administer the Social Security Act. The regulations under the Medicaid Act are codified primarily at 42 C.F.R. Parts 430–456 (1981). Part 442 contains substantive standards relating to skilled nursing facilities and intermediate care facilities.

From 1972 through 1980 Congress required the Secretary to reimburse the states for all the necessary costs of inspection of long-term care facilities. 42 U.S.C. § 1396b(a)(4). In 1980 Congress reduced the rate of reimbursement to 75% of such costs. *Id.* § 1396b(a)(2). In conducting surveys of facilities pursuant to 42 U.S.C. § 1396a(a)(33), the states must use federal standards, forms, methods and procedures. 42 C.F.R. § 431.610(f)(1) (1981).

Particularly at issue in this case is HHS' development of the forms required for the states to demonstrate that facilities participating in the Medicaid program under an approved state plan meet the conditions of participation which are contained in the Act. Form SSA–1569 is the form which HHS has required the states to use. It is said to be defective because it is "facility-oriented" rather than "patient-oriented." That characterization is appropriate and HHS has admitted it repeatedly.

Beginning in 1975, HHS has financed studies to change Form SSA–1569 and the reporting procedure, with an emphasis on actual patient care. That process began as the result of a direction from President Nixon following reports which found glaring deficiencies in the services being provided by nursing homes throughout the United States. HHS' outside research and internal efforts culminated in the proposed regulation published in July 1980, which was cited as the reason for the stipulation for a stay of proceedings in this litigation, discussed *supra* at 6. That proposed regulation was withdrawn by the Secretary and, during the trial of this matter, evidence was presented that HHS' policy may change in a direction opposite to that advocated by the plaintiffs: toward more self-regulation within the nursing home industry, and greater flexibility in reporting on compliance with federally mandated standards contained in approved state plans.

### The Plaintiffs' Claims

■ It is clear from the evidence in this case that it is feasible for the Secretary to require the use of a patient care management system which would control the assessment of patient needs, facilitate the development of an appropriate patient care plan, provide the mechanism for monitoring the delivery of care by the facility itself and by the state review teams, give SSA the means for validating the state reports, and probably improve the quality of health care services provided for all Medicaid recipients. The question then, is not whether such a system is possible or feasible, or whether it is desirable. The issue before this court is whether the failure to introduce and require the use of such a system is a violation of a statutory duty. The answer is no.

The Medicaid Act does not provide a substantive standard for the medical care to be provided under a state plan. Under 42 U.S.C. § 1396a(a)(9)(A) the responsibility for establishing and maintaining health standards for provider institutions is given to the state health agency, and under § 1396a(a)(22)(A) it is the state which determines the kinds and numbers of professional medical personnel and supporting staff that will be used in the administration

of the plans. Under subsection (D) the state plan must include "other standards and methods that the State will use to assure that medical or remedial care and services provided to recipients of medical assistance are of high quality." And under § 1396a(a)(33), the inspection of nursing homes for survey and certification purposes is the responsibility of the state survey agency under contract with the state agency which administers the state Medicaid plan. In Colorado, the state agency designated to administer the plan is the Colorado Department of Social Services, pursuant to the Colorado Medical Assistance Act, C.R.S. 1973 § 26–4–104, and the designated state survey agency is the Colorado Department of Health.

The plaintiffs have placed particular emphasis on the "look behind" provision in § 1396a(a)(33)(B) which authorizes the Secretary to reject a survey certification performed by the state agency and to substitute the Secretary's own independent and binding determination. That is nothing more than permitted authority to intervene for the purpose of protecting the public funds used to reimburse the state.

As an independent basis for the claimed federal enforcement duty, the plaintiffs point to several rulemaking provisions of the Medicaid Act. Section 1302 is a general mandate to the Secretary to make and publish such rules and regulations "as may be necessary" to the administration of the entire Social Security Act. Absent a specific substantive duty under some other provision of the Social Security Act, § 1302 does not impose any rulemaking duty on the Secretary. Section 1396a(a)(33)(A) provides that the state plan for medical inspection and review should be "consistent with regulations prescribed by the Secretary." Even if this provision, coupled with § 1302, requires the Secretary to promulgate regulations regarding survey and certification by the designated state survey agency, the Secretary has complied with that mandate by enacting detailed regulations which set forth state plan requirements, standards, procedures, and conditions for obtaining federal funding in state Medicaid programs. 42 C.F.R. Parts 430–456 (1981).

The plaintiffs have advanced the argument that § 135 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324, is a Congressional direction to the Secretary. I disagree. That section simply imposes a six-month moratorium on changes in certain regulations, including regulations relating to Medicaid certification and requirements for skilled nursing facilities and intermediate care facilities. It gives no indication of Congressional intent regarding the Secretary's duties under the Medicaid Act.

The structure of the Medicaid Act is strikingly similar to the Developmentally Disabled Assistance and Bill of Rights Act, considered by the Supreme Court in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), and to the Education for All Handicapped Children Act of 1975, considered by the Supreme Court in *Hendrick Hudson Central School District v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). In both of those decisions, the Court was quite explicit in cautioning that in interpreting such "federal-state cooperative programs" the courts must not impose duties beyond those clearly indicated in the legislation. Specifically, the fact that Congress has acted to encourage the states to adopt programs for the improvement of the lives of disadvantaged persons is not the equivalent to a statutory right to a particular level of improvement.

■ In sum, the plaintiffs' position is a distortion of the statutory scheme of the Medicaid Act. The primary planner and the initial actor in this welfare program is the state. The national government, acting through the Secretary, provides financial assistance for the provision of services under the state plan and for its administration. The federal enforcement mechanism lies in the reduction of the amount of payments or termination of payments through a disapproval of a plan which no longer is meeting the statutory requirements for participation. Accordingly, even if it is as-

sumed that the members of the plaintiff class have some statutory entitlement to a certain standard of "quality care," and that there has been a denial of that entitlement, the enforcement remedy could not be a writ of mandamus against the Secretary to impose additional requirements on the state. The limit of the mandamus remedy would be an order for the Secretary to terminate all payments by a disapproval of a plan gone awry. That is not the relief sought in this case.

The plaintiffs also have asserted that the residents of nursing homes have a constitutional right to the care necessary to prevent "their pre-existing self-care skills from deteriorating because of their confinement in a nursing home." The language of Justice Blackmun in a concurring opinion in *Youngberg v. Romeo,* —— U.S. ——, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), is urged in support of this contention. There may be merit to that claim, but it is not the Secretary of HHS who has confined these patients. Accordingly, he is not the proper defendant. This constitutional claim is not appropriately made against the Secretary, or the United States.

In considering the claims in this case, it is important to remember the traditional role of the respective governments in health services. It is the state which determines the qualifications for the licensing of the persons and facilities permitted to participate in the delivery of such services. In Colorado, there is extensive regulation of long-term care facilities and of the various professionals who play a role in long-term health care delivery.

The Colorado Department of Health is responsible for the licensing of hospitals, including nursing care facilities and intermediate care facilities. C.R.S.1973 § 25–3–101. The department has the authority to adopt rules and regulations setting substantive standards for license applicants, as well as the authority to revoke or suspend a license if the institution has failed to meet statutory requirements and to comply with the rules and regulations of the department. *Id.* § 25–3–103. In addition to the general provision for summary suspension of a license where the licensing agency has reason to believe that the public health or welfare is endangered, *id.* § 24–4–104(4), there is a special receivership mechanism to be used in the revocation or suspension of licenses of nursing care facilities and intermediate care facilities, which permits patients to remain at the institution on a temporary basis, and which automatically grants the receiver a new license and certifies the receiver for Medicaid participation. *Id.* § 25–3–108(1), (7).

A separate state statute, with an express legislative purpose of providing "a measure of protection to the aged and handicapped residents of nursing homes in this state," regulates nursing home administrators. *Id.* tit. 12, art. 39. That article creates a board of examiners of nursing home administrators which is responsible for the licensure of those administrators and for the development and enforcement of standards "designed to insure that nursing home administrators will be individuals who are of good character and are otherwise suitable and who, by training or experience in the field of institutional administration, are qualified to serve as nursing home administrators." *Id.* § 12–39–105(1)(a). Section 12–39–105(4) grants the board of examiners of nursing home administrators the authority to make rules and otherwise to take steps to enable it to comply with 42 U.S.C. § 1396g; that section of the Medicaid Act sets out the requirements of a state program for licensing of nursing home administrators, which is a required feature of an approved state Medicaid plan, under 42 U.S.C. § 1396a(a)(29).

In addition to direct state regulation of nursing homes and skilled nursing facilities and of nursing home administrators, the state plays a critical role in the licensing and regulation of the various professions which take part in the delivery of health care through those institutions. *See* C.R.S. 1973 tit. 12, art. 36 (Colorado Medical Practice Act); *id.* art. 38 (Nurse Practice Act, regulating practical nurses and registered nurses); *id.* art. 22 (regulating the practice

of pharmacy); *id.* art. 41 (Physical Therapy Practice Act of 1979); *id.* art. 42 (regulating psychiatric technicians); and *id.* art. 43 (regulating psychologists).

These state statutes, and their implementing rules and regulations, provide the means for the state to develop and enforce standards of long-term care independently of the federal government. The Medicaid Act in no way limits the power of the states to impose licensing requirements on facilities and individual health care administrators and practitioners which exceed the requirements under the Act. Indeed, evidence was presented that several states have taken this step. Of course, independent state enforcement of long-term care quality generally requires an additional commitment of state resources, over and above that provided by the federal government for survey/certification under 42 U.S.C. § 1396a(a)(33), since the states are not reimbursed for costs incurred in inspecting facilities for compliance with state standards only. 42 C.F.R. § 431.610(h)(2) (1981). *See Comment—A Critical Evaluation of the Federal Role in Nursing Home Quality Enforcement,* 51 U.Colo.L.Rev. 607, 616–17 n. 79, 629 n. 126 (1980).

Nothing in the Medicaid Act supersedes the state function of licensure. Indeed, 42 U.S.C. § 1396g requires the state to enact a program for the licensing of nursing home administrators, including the development and enforcement of licensing standards. The cancellation of provider agreements and the de-licensure of nursing homes are the primary sanctions for failures to deliver adequate care to patients in nursing homes. The federal government's enforcement mechanism is simply to pay or to withhold funds from the state. While that power to withhold funds may be the leverage for the exercise of the kind of control which the Colorado plaintiffs would yield, the Secretary's refusal to assert such control is not a refusal to perform a statutory duty.

During the trial of this case, it became clear that Colorado officials understand that the state can cause improvement in the conditions in the nursing homes which the state licenses and regulates. It is also apparent that what is lacking is the resolve to dedicate the necessary resources to this task. It would appear easier to seek a declaration of subservience to the national government to avoid the expenditure of state funds, as well as the responsibility for lack of enforcement. In short, to substitute feudalism for federalism.

In essence, the plaintiffs are asking this court to transform Medicaid into a national health care program. To grant the mandamus remedy requested would be to rewrite the statute. If the Secretary were to exercise the degree of control which the plaintiffs request, there would be a substantial effect on the physician-oriented system of medical care which currently exists in the United States, including in facilities participating in the Medicaid program. Essentially, the system would become nationalized in that both funding and delivery would become the responsibility of the federal government. That is far from the intent of the Congress as disclosed in the statute as originally written and as amended.

Based on the evidence presented at trial and on my analysis of the Medicaid Act, I hold that the Secretary's failure to introduce and require the use of a patient care management system of the sort advocated by the plaintiffs is not a violation of his statutory duties under the Act. Therefore, the plaintiffs' claims against the federal defendant must be dismissed. Insofar as the plaintiffs seek mandamus relief, those claims are dismissed for lack of subject matter jurisdiction, since if there is no duty that is appropriately enforced through mandamus relief, then the court lacks jurisdiction under 28 U.S.C. § 1361. *Carpet, Linoleum & Resilient Tile Layers Local 419 v. Brown,* 656 F.2d 564, 567 (10th Cir.1981). The plaintiffs' claims for relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706, are dismissed on the merits. The absence in the Medicaid Act of substantive standards for the medical care to be provided under state plans, Congress' recognition of the states' responsibility for setting such standards under their plans, and

the discretion vested in the Secretary under the Act, compel the conclusion that the Secretary's implementation of the survey/certification requirement has not been arbitrary, capricious or an abuse of his discretion. Because the plaintiffs have failed to state a claim against the Secretary for violation of the class' constitutional rights, the § 1983 claim must be dismissed also.

It is important to recognize that in this opinion there is no determination with respect to the responsibility of the State of Colorado, Colorado State Department of Health, the Colorado Department of Social Services, and the individual nursing homes that are defendants in this case. All that has been decided is that neither the members of the plaintiff class nor the state plaintiffs in intervention have proved any recognized claims for relief against the federal defendant. The Secretary is entitled to the entry of a judgment of dismissal and there is no just reason for delay in making that judgment final, thereby permitting an immediate appeal under Rule 54(b) of the Federal Rules of Civil Procedure.

The extensive evidence presented in this case and the earnest arguments of counsel for the plaintiffs deserve some additional comment. There is a manifest need for improvement in the conditions of nursing homes and the care which is provided to welfare patients who are housed in them. The desire to alleviate human suffering is a compelling human impulse which easily can generate a Dionysian response. It is perhaps easier to seek redress in the authoritarianism of a court than to ask for change from the politically accountable branches of government at both the state and national levels. It is my considered judgment that to provide the requested remedies would be an abuse of this court's authority and an abridgment of the constitutional restrictions on the separation of powers among the branches of government.

Accordingly, considering the foregoing to be the findings of fact and conclusions of law, it is

ORDERED, that the claims of the plaintiffs and plaintiffs in intervention against the Secretary of Health and Human Services are dismissed, judgment shall enter in favor of the defendant Secretary of Health and Human Services, and that the defendant is entitled to the recovery of costs as against the plaintiffs in intervention from the time of the filing of the complaint in intervention. No costs are awarded against the plaintiff class. Additionally, there being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk shall forthwith enter judgment in accordance with this memorandum opinion and order.