**In the Matter of PARK NURSING CENTER, INC., a Michigan non-profit corporation, Debtor.**

**PARK NURSING CENTER, INC., Plaintiff,**

v.

**MICHIGAN DEPARTMENT OF SOCIAL SERVICES, Defendant.**

Bankruptcy No. 79–03378–W.
Adv. No. 81–0264–W.

United States Bankruptcy Court, E.D. Michigan, S.D.

March 21, 1983.

794

Roger H. Leemis, Detroit, Mich., for plaintiff.

Ronald W. Carlson, Lansing, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER
GEORGE E. WOODS, Bankruptcy Judge.

### I. *Introduction*

In the matter before the Court, Park Nursing Center, Inc. (Park) challenges the plant cost limit component of the prospective reimbursement system of the Michigan Medicaid program as developed and administered by the Michigan Department of Social Services (DSS).

Park is a Michigan non-profit corporation operating as debtor in possssion under Chapter 11 of the Bankruptcy Code. Park is licensed as a skilled Long Term Care Facility (LTCF) by the Michigan Department of Public Health (MDPH). Skilled LTCFs provide the highest level of nursing care for the elderly and chronically ill. LTCFs are reimbursed for services rendered to Medicaid-eligible residents by state money and matching federal funds under the Grants to States for Medical Assistance Programs. Title XIX, § 1901 *et seq.* So-

cial Security Act of 1935, codified at 42 U.S.C. § 1396 *et seq.* Facilities entitled to reimbursement for services rendered to Medicaid patients pursuant to Title XIX are also known as "providers".

DSS is a department of the executive branch of government of the State of Michigan. It is the single state agency under the terms of the Social Security Act, 42 U.S.C. § 1396a(a)(5), designated to administer the Medicaid program in Michigan.

To participate in the optional federal funding program, a state must submit a State Plan for Medical Assistance to the United States Department of Health and Human Services (HHS)[1] for its approval. 42 U.S.C. § 1396. Provided the state plan conforms to federal regulations, 42 U.S.C. § 1396(a)1–41, the Secretary of HHS must, with certain exceptions, approve the plan. 42 U.S.C. § 1396a(b).

The State Plan reimburses LTCFs based on a method of determining the "allowable costs"[2] of medical services up to a limit or ceiling. Prior to July 1, 1978, Michigan employed a "retrospective" method of reimbursement; subsequent to July 1, 1978, Michigan has utilized a "prospective" method.

Park asserts the development and application of the plant cost limit component of the prospective method is contrary to: (1) the Social Security Act, (2) the Michigan Administrative Procedures Act, (3) the Equal Protection and Due Process clauses of the United States Constitution, and (4) its provider agreement.

Upon an in-depth examination of the record herein, the Court adopts the proposed findings of fact and conclusions of law submitted by DSS with the exception of those conclusions relating to lack of jurisdiction. The complexity of the case, however, compels the Court to elaborate further upon such findings and conclusions.

---

**1.** Formerly the United States Department of Health, Education and Welfare (HEW).

**2.** Some items of allowable costs were formerly specified by federal regulations 42 C.F.R.

## II. *Background*

### A. Federal Legislation and HHS

Prior to 1972 Congress had not provided guidance as to how reimbursement rates for nursing care facilities participating in Medicaid should be set. In 1972, however, Congress enacted a standard for reviewing the method of setting state rates:

(a) A state plan for medical assistance must . . .

(13) provide . . .

(E) Effective July 1, 1976, for payment of the skilled nursing facility and intermediate care facility services provided under the plan on a *reasonable cost related basis,* as determined in accordance with methods and standards which shall be developed by the State on the basis of cost finding methods approved and verified by the Secretary; . . .

42 U.S.C. § 1396a(a)(13)(E)(1974) (added as part of the Social Security Amendments of 1972, P.L. 92–603 § 249) (emphasis added).

The motivation of Congress in enacting the above standard has been enunciated as follows:

This addition was motivated by Congress' desire to give guidance to states in setting reimbursement rates which would avoid the then existing problem of flat rates. That type reimbursement methodology had led to overpayment to some facilities, resulting in private profit at public expense, and underpayment to others, providing too little reimbursement to ensure good care for the residents. At the same time, Congress sought to avoid mandating that states follow the cumbersome Medicare reimbursement formula set forth in Title XVIII of the Social Security Act of 1935, which provides for reimbursement of "reasonable costs." 42 C.F.R. § 405.454. The compromise standard of "reasonable cost related basis" was intended to give states the flexibility

---

§§ 447.278–447.284. These regulations were removed September 30, 1981, 45 F.R. 47971. Allowable costs as detailed in the Michigan State Plan are discussed *infra* at n. 10.

to experiment with various reimbursement methodologies, including—but not limited to the Medicare method of "retrospective reasonable costs" reimbursement, *see* 41 F.R. 27300 (July 1, 1976), in order to develop acceptable cost finding techniques while eliminating arbitrary flat rate reimbursement plans.

*Coalition of Michigan Nursing Homes v. Dempsey,* 537 F.Supp. 451, 455 (E.D.Mich. 1982).

In 1980, Congress replaced the "reasonable cost-related" standard for reimbursement with a new standard which states:

(a) A state plan for medical assistance must . . .

(13) provide . . .

(E) for payment . . . of the skilled nursing facility and intermediate care facility services provided under the plan through the use of *rates (determined in accordance with methods and standards developed by the State) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities* in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each skilled nursing or intermediate care facility and periodic audits by the State of such reports; . . .

42 U.S.C. § 1396a(a)(13)(E) (as amended by the Omnibus Budget Reconciliation Act (OBRA) of 1980), P.L. 96–499 § 962(b), effective October 1, 1980 (enacted December 5, 1980) (emphasis added). The new standard, known as the Boren Amendment, was motivated by Congress' continuing dissatisfaction with the amount of money being expended and the desire to eliminate the paperwork requirements involved in administering the reasonable cost related standard. *Dempsey,* 537 F.Supp. at 455–456, (citing 46 F.R. 47966 (September 30, 1981); 42 C.F.R. §§ 447.274–447.296 (removed September 30, 1981, 46 F.R. 47971) and the Michigan State Plan Attachment 4.19–D).

B. State Legislation and DSS

Prior to July 1, 1978, DDS, with the approval of the United States Department of Health, Education and Welfare (HEW), utilized the federal Medicare method of retrospective reasonable cost as the sole basis of state Medicaid reimbursement. The retrospective system was constructed of two component parts: the plant cost component and the variable cost component. The plant cost component consisted of a facility's costs for interest, tax, depreciation and finance fees. The variable cost component consisted of the operating costs of the facility. The retrospective reimbursement system required audits at the end of the fiscal year, with adjustments made for allowable costs. Facilities were reimbursed for costs up to a single specified ceiling.[3]

On July 1, 1978, Michigan instituted the prospective reimbursement plan. The prospective method has two payment limits: one for variable costs and one for plant costs. It is the plant cost limit which is challenged by Park in the present action. The plant costs include interest, depreciation, finance fees and property taxes.[4]

The conception, development and implementation of the prospective reimburse-

---

**3.** Ceiling rates for all costs for February 1977 were $21.90 per patient day for basic facilities and $23.75 per patient day for skilled facilities.

**4.** The plant cost limit breakdown was as follows:

| Cost Component | Dollar Amounts |
| --- | --- |
| Depreciation Expense | 1.569 |
| Interest Expense | 2.969 |
| Financing Expense | 0.137 |
| Property Tax Expense | 0.687 |
| Plant Cost Limit (7/1/78) | $5.36 |

The July 1, 1978 State Plan provided in pertinent part:

The per patient day Plant Cost Limit (PCL) is the fixed cost value that would be paid by a

ment system was instituted by direction of the Michigan legislature via Appropriations Acts. *See e.g.,* 1973 P.A. 131, § 18; 1974 P.A. 241, § 22; 1975 P.A. 241, § 23(5). As required by the Appropriations Acts, a governor's task force was formed to develop a reimbursement system. The task force consisted of representatives of the nursing home industry, the DDS, the Department of Health, the Department of Management and Budget, and the legislature.

In 1975, a sub-committee of the third governor's task force [5] developed a proposal for a reimbursement rate where the plant cost limit would be set on the basis of a

survey of the most recently constructed nursing homes and an analysis of the historical cost of those facilities.[6] The proposal was submitted to the governor and the legislature in 1976, and subsequently approved.

In determining the plant cost limit, DSS surveyed 17 nursing homes constructed between January of 1975 and December of 1977.[7] The survey was based on unaudited data submitted by the certified public accountants, financial and administrative officers of the various facilities.[8]

The plant cost limit was calculated by finding the newly constructed nursing home average for interest expense, depreciation expense, finance fees and property taxes.

recently economically constructed, and prudently financed facility. The calculation of this value is based on a recent survey of homes actually built over the last three years, updated to July 1, 1978 using the U.S. Department of Commerce Composite Construction Index as published in the *Survey of Current Business.* The value of depreciation expense is based on the mean of the surveyed values of depreciable assets. The depreciation rate is the average depreciation rate for assets of similar type determined using IRS guidelines for useful lives using straight line depreciation. The value for interest expense is based on the surveyed mean of interest rates paid by facilities constructed during the last three years. The value for property taxes is based on the mean of property taxes of the surveyed tax paying facilities. This Plant

Cost Limit is updated annually to reflect the rate of increase in property taxes and standards and regulations which affect plant costs.
Attachment 4.19–D at 5.

**5.** Two prior committees were unable to reach agreement on a proposal for revising the Michigan Medicaid system.

**6.** This was actually the second proposal. The third task force had developed a proposal for reimbursement on plant costs based on a return on the percentage of total borrowings plus net equity limited by replacement cost minus depreciation. This proposal was rejected by HEW because the return on total borrowings was unacceptable.

**7.** Park was one of the 17 facilities surveyed. The other facilities were:

Birchwood Nursing Center
Grand Rapids, Michigan

Church of Christ Care Center
Mt. Clemens, Michigan

Clintonaire Nursing Centre
Mt. Clemens, Michigan

Countryside Nursing Home
South Haven, Michigan

Holland Home – Raybrook Manor
Grand Rapids, Michigan

Iron River Nursing Home, Inc.
Iron River, Michigan

Lexington House Centre-Taylor
Taylor, Michigan

Livingston Care Center, Inc.
Howell, Michigan

Fr. Murray Rehabilitation-Nursing Center, Inc.
Centerline, Michigan

Pine Oaks Nursing Center
Allegan, Michigan

Provincial House Battle Creek
Battle Creek, Michigan

Provincial House South
Lansing, Michigan

Provincial House Traverse City
Traverse City, Michigan

The Salvation Army Eventide Nursing Unit
Detroit, Michigan

Sherbrooke Nursing Home
Grand Rapids, Michigan

Venoy Continued Care Center, Inc.
Wayne, Michigan

**8.** Audited data was not available for all new facilities. Testimony presented by DSS indicated that audits generally reduce allowable costs.

The calculation of the average interest expense was based on a 75% debt-asset ratio (loan to value ratio) limit to borrowing [9] and a 9.54% interest rate weighted average. The calculation of the depreciation expense was based on 40 years straight line depreciation for buildings, 18.9 years for building improvements and 100% patient occupancy. The calculation of the property tax factor excluded non-profit homes for purpose of calculation only and was also based on 100% occupancy.

DSS updated the survey results to July 1, 1978 by use of an adjustment for inflation, based on the United States Department of Commerce Construction Cost Index (USDCCCI). In adjusting for inflation the facilities' costs were updated from their certification for occupancy dates.

Neither the method of developing the plant cost limit nor the assumptions made in analyzing the data were provided for by state or federal statute or regulation.

As adopted, the state plan provides for payment to LTCFs based on a calculation of actual allowable costs for both the variable cost component and the plant cost component.[10] Both cost components are calculated on a per patient day (ppd) basis.

The plant cost limit developed as of July 1, 1978 was $5.36 ppd. The limit applies to all LTCFs constructed prior to July 1, 1978. The limit of $5.36 ppd represents the 95th percentile.[11] The 1978 facilities plant cost limit is updated annually by the inflation factor based on the USDCCCI and actual average taxes per diem in Michigan. At the time of the trial, August 1982, the plant cost limit was $5.41 ppd.

LTCFs in operation prior to July 1, 1978, which were sold subsequent to that date and refinanced, have a plant cost limit of $6.91 ppd for the third quarter of 1981. This plant cost limit is set by updating the original limit in addition to updating the interest expense portion of the original plant cost limit by the same inflation factor quarterly.

LTCFs that have come into operation subsequent to July 1, 1978 have a plant cost limit of $9.77 ppd for the third quarter of 1981. This plant cost limit is set by updating the interest expense portion, the asset depreciation portion, the finance fee portion and the tax portion of the original plant cost limit based on the use of the construction cost index.[12]

## C. Park Nursing Center, Inc.

Park was incorporated in 1972. In 1977, construction on its 265 bed LTCF located in Taylor, Michigan was completed. In February of 1977, Park was certified for occupancy as a skilled LTCF under the Michigan Medicaid program.

The delay from the date of incorporation to the date of completion is attributable in part to financing difficulties and construction costs. Park was financed by means of tax exempt bonds. The original prospectus for the facility called for tax exempt bonds of 8% to 8½% to be issued with maturities from 20 to 30 years. The interest rate was subsequently raised to 10% and the maturi-

**9.** Evidence presented at trial indicated that DSS was aware that nursing homes were able to obtain 90% up to 100% or more financing, but chose 75% to discourage excessive borrowing.

**10.** Allowable costs, as detailed in the Michigan State Plan, § III, include costs for routine services; e.g., room, board, nursing care and medical equipment for multiple patient use; costs for compliance with government regulations and standards, and owner/administrators' salaries.

**11.** E.g., 95% of those homes surveyed had costs less than $5.36 ppd.

**12.** In addition, proprietary LTCF providers whose actual allowable plant costs are below the applicable plant cost limit were allocated to keep up to $.50 ppd prior to January 1, 1982. The State Plan labels these differentials between actual variable and plant cost components and the variable and plant cost limits a "profit factor". It would be more accurate to demonstrate the retained portion of the differential an "incentive factor". See Supplemental Statement of Basis and Purpose of Regulations, 43 F.R. 4863 (Feb. 6, 1978). This factor is not applicable to a non-profit home like Park.

ty dates were shortened to August 1, 1979.[13] Collectively, the costs and financing fees for obtaining tax exempt construction bonds in the amount of $5,300,000.00 exceeded $1,000,000.00. Additionally, Park incurred $400,000.00 of acquisition costs for equipment.

In March of 1977 and every year thereafter, Park signed a provider agreement with the State of Michigan. The provider agreement states that reimbursement to Park, as the provider under the Medicaid program, shall be in accordance with established state and federal reimbursement policies and subject to such conditions for reimbursement as may be established by law. It further states that Park agrees to accept direct payment, from the State, as payment in full, by the recipient, for services received, and agrees not to seek additional or supplemental payments from the recipient, or his representative, for authorized services provided and paid for under these programs.

Park opened in April of 1977. Park's unified ceiling rate for the period of April 1, 1977 through March 31, 1978 was established at $24.28 ppd. From April 1, 1978 to June 30, 1978, Park was reimbursed at the rate of $25.42 ppd. This was the maximum ceiling rate under the retrospective system.

Under the prospective reimbursement system, effective July 1, 1978, Park's combined reimbursement rate was $29.04 ppd. Park's plant cost limit was $5.36 ppd.[14] Park has costs attributable to the plant component of $8.07 ppd.

For the year ending March 31, 1979, Park showed a loss of $684,695.00.[15] On October 11, 1979, Park filed for relief under Chapter 11 of the Bankruptcy Code. On February 19, 1981, the present adversary proceeding was filed.

### III. *Issues*

The issues raised before this Court are as follows: (1) whether the Court has jurisdiction over the proceedings, (2) whether the prospective reimbursement method adopted by the State of Michigan is valid under the Social Security Act, (3) whether the DSS was required to promulgate the state Medicaid system pursuant to the state administrative procedures act, (4) whether the State of Michigan has breached the provider agreement in effect between the parties, and (5) whether DSS' application of the prospective method of reimbursement denies Park equal protection and due process of law under the United States Constitution. In order to evaluate the merits of the claims, it is necessary to review them seriatim.

### IV. *Jurisdiction*

DSS raises two challenges to the jurisdiction of the Court: subject matter jurisdiction and Eleventh Amendment immunity.

■ DSS first asserts that the Court lacks jurisdiction to conduct an adversary proceeding as to federal and state law claims because the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101 *et seq.,* contains an impermissible delegation of Article III powers to an Article I Court. DSS relies on *Northern Pipeline Construction Company v. Marathon Pipeline Company,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The Court finds DSS' position to be without merit. The present action was tried and taken under advisement prior to December 24, 1982. The Supreme Court stayed its decision in *Northern Pipeline* until December 24, 1982; this Court therefore retained jurisdiction until that date. On December 25, 1982, the Emergency Bankruptcy Rule went into effect. Subsection (h) of the Rule provides that any matter pending before a Bankruptcy Court on December 25, 1982, is deemed referred to that Court.[16]

---

**13.** The revised period constitutes four years, generally considered a short maturity period for construction bonds.

**14.** See, discussion *supra* at 798–99.

**15.** Park's accumulated deficit as of March 31, 1979 totaled $1,922,081.00.

**16.** Emergency Bankruptcy Rule (h) provides in pertinent part:

Any bankruptcy matters pending before a bankruptcy judge on December 25, 1982 shall be deemed referred to that judge.

This Court thus has the power to make findings of fact and conclusions of law with respect to the present proceeding and to enter its own final order.

Second, DSS asserts that the Court is barred from awarding money damages by the Eleventh Amendment of the United States Constitution. In light of its resolution of the issues, the Court declines to address the Eleventh Amendment question. For a discussion of the problems posed by the Eleventh Amendment in Medicaid cases see *Ohio v. Madeline Marie Nursing Homes,* 694 F.2d 449, 457–462 (6th Cir.1982),[17] and *Dempsey,* 537 F.Supp. at 464.

### V. The Social Security Act

Park challenges the plant cost limit of the prospective reimbursement system as invalid under the Social Security Act. The Medicaid program was created by Title XIX of the Social Security Act, as amended, 42 U.S.C. § 1396 *et seq.* It was described by the Supreme Court in *Harris v. McRae,* 448 U.S. 297, 308, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784 (1980), as:

a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons. Under this system of "cooperative federalism," if a State agrees to establish a Medicaid plan that satisfies the requirement of Title XIX ... the Federal Government agrees to pay a specified percentage of "the total amount expended ... as medical assistance under the State plan...." The cornerstone of Medicaid is financial contribution by both the Federal Government and the participating State.

(Citations omitted).

 From the program's inception, Congress intended for state Medicaid agencies to promulgate regulations to insure that allowable costs were incurred in a reasonable manner consistent with the purpose of the federal Medicaid legislation. *Carbon Hill Health Care, Inc. v. Beasley,* 528 F.Supp. 421, 423 (N.D.Ala.1981); *Alabama Nursing Home Association v. Harris,* 617 F.2d 388, 392 (5th Cir.1980). Federal Medicaid legislation in effect between 1972 to 1980, 42 U.S.C. § 1396a(a)(13)(E) required that payments be made on a reasonable cost related basis established by the state plan. *Unicare Health Facilities, Inc. v. Miller,* 481 F.Supp. 496 (N.D.Ill.1979). The standard for a reasonable cost related basis with respect to a prospectively determined rate was that level which the state reasonably expected to be adequate to reimburse in full such actual allowable costs of an economically and effectively operated facility. *Alabama Nursing Home Association v. Harris,* 617 F.2d at 392 citing 42 C.F.R. 450.-30(a)(3)(iv)(A) (1977).[18]

 The legislative history of Title XIX indicates that within the above limits the states were free to experiment with methods and standards for payment. *Alabama Nursing Home Association v. Harris,* 617 F.2d at 392 (citing S.Rep. No. 92–1230, 92 Cong., 2d Sess. 287 (1972)). As noted by the Court in *Harris:*

The Boren amendment to 42 U.S.C. § 1396a(a)(13)(E), effective October 1, 1980, similarly provides that the state plan must provide for payment

of the skilled nursing facility and intermediate care facility services provided under the plan through the use of *rates (determined in accordance with methods and standards developed by the State) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities.*

(Emphasis added).

---

The Rule was upheld as valid by the Eastern District of Michigan in *Prudential Ins. Co. v. Stouffer Corp.,* 26 B.R. 1019 (E.D.Mi.1983).

**17.** *In re Madeline Marie Nursing Homes,* 694 F.2d 433 (6th Cir.1982), and *Ohio v. Madeline Marie Nursing Homes,* 694 F.2d 449 (6th Cir. 1982), are companion cases; both were decided on November 29, 1982, but were heard by different panels. The cases arose in the course of bankruptcy proceedings and concern complex state and federal statutory and regulatory schemes involved in the delivery of Medicaid services in Ohio.

**18.** The relevant regulations are currently codified at 42 C.F.R. §§ 447.252–.316.

Congress approved the setting of reasonable cost related rates on either a prospective or retrospective basis. *See* Senate Report at 288. *See also* 43 Fed.Reg. at 4,861–63. Congress similarly approved the setting of payment rates on a geographical, class, or facility-by-facility basis. *See* Senate Report at 287–88. *See also* 43 Fed.Reg. at 4,862–64; 41 Fed.Reg. at 27,304. Additionally, Congress intended that states have freedom both to define allowable cost items and to set a value on the reasonable cost of such items. *See* Senate Report at 287. *See also* Fed.Reg. at 27,303.

617 F.2d at 392.

The Sixth Circuit recognized the flexibility that the states possess in selecting reasonable cost related reimbursement rates in *In re Madeline Marie Nursing Homes,* 694 F.2d 433 (6th Cir.1982). The Court ruled that federal Medicaid legislation could "in principle" encompass a prospective reimbursement system, further that a prospective system, if otherwise reasonable, is not rendered less so because payments under it do not unerringly match the actual costs incurred by the provider. 694 F.2d at 442–443. The Sixth Circuit based its ruling on the following language from a First Circuit opinion upholding the Massachusetts prospective reimbursement system:

> As observed by the district court, the legal issue is not whether the complex Plan is perfect, but whether under the Federal system of reimbursement, which has among its objectives the valid goal of providing incentives for efficiency and economy, the Plan can be said to provide for "payment of the reasonable cost of inpatient hospital services." The answer

lies not in an assessment of policy, for that is the function of the state and Federal agencies, but in an analysis of the record presented to these agencies in light of the statutory and constitutional requirements. We conclude, as did the district court, that neither the language of the statute and regulations nor the evidence presented below supports appellant's contention in this case.

The hospital contends that Congress intended "reasonable costs" of inpatient hospital services under Medicaid to mean full payment of the actual cost thereof. If Congress had intended "reasonable costs" to be synonymous with "actual costs", however, there would have been no reason for the amendments as promulgated by Public Law 92–603, 42 U.S.C. § 1396(a)(13)(D), to provide for the "reasonable cost" program.

*Massachusetts General Hospital v. Weiner,* 569 F.2d 1156, 1158–59 (1st Cir.1978), *quoted in Madeline Marie Nursing Homes,* 694 F.2d at 443.[19]

■ Park's challenge to the plant cost limit of the prospective reimbursement system as invalid under the Social Security Act may be reduced to three major arguments: that the Michigan system of prospective reimbursement is in conflict with and therefore preempted by federal law; that the state cannot set a limit on payments for Medicaid reimbursement if that limit results in a failure to pay a provider its actual cost; that, even assuming the state may set a below cost limit, the prospective method employed by DSS is contrary to the Social Security Act. The Court rejects all three assertions, for the following reasons.

**19.** Subsection (D) required that the state provide:

> for payment of the reasonable cost of inpatient hospital services provided under the plan, as determined in accordance with methods and standards, consistent with section 1320a–1 of this title, which shall be developed by the State and reviewed and approved by the Secretary and (after notice of approval by the Secretary) included in the plan, except that the reasonable cost of any such services as determined under such methods and standards shall not exceed the

amount which would be determined under section 1395x(v) of this title as the reasonable cost of such services for purposes of subchapter XVIII of this chapter; and [text of subsection (E)].

It was repealed effective August 13, 1981. P.L. 97–35.

Other unsuccessful challenges to state Medicaid systems may be found in *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d 841 (5th Cir.1975); *American Health Care v. Califano,* 443 F.Supp. 612 (D.C.Cir.1977).

First, challenges to state regulations as being in conflict with an allegedly preemptive federal statute are not favored. Rather, the presumption is that the state has acted within its authority and consistent with applicable federal law. *Beasley,* 528 F.Supp. at 423 citing, *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981). Those challenging the state's regulatory scheme have a burden in proving a set of facts which would support their claim for relief, *Madison v. Mississippi Medicaid Commission,* 86 F.R.D. 178 (1980), which has not been met in the present case.

Second, under the Medicaid Act, as interpreted by the Sixth Circuit, the state is not required to reimburse a provider for its actual and allowable costs. Federal law merely requires that payments be made on a reasonable cost related basis established by the state plan, even where the method used results in underpayment to some providers. *See, Madeline Marie Nursing Homes,* 694 F.2d at 440–443; *Unicare Health Facilities v. Miller,* 481 F.Supp. at 499.

Finally, where, as in the present case, the federal agency charged with administering the Social Security Act approves the state plan it expresses its view that the plan is in compliance with applicable statutes and regulations. The interpretation of such an agency is entitled to substantial deference. *Reese v. Quern,* 606 F.2d 732, 736 (7th Cir.1979), *cert. denied* 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802. *See also, Quern v. Mandley,* 436 U.S. 725, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978). Moreover, attached to the actions of administrative agencies is a presumption of validity. *Alabama Nursing Home Association v. Harris,* 617 F.2d at 393. Park has not submitted evidence sufficient to rebut that presumption.

## VI. *Michigan Administrative Procedures Act*

Park argues that the prospective Medicaid reimbursement system, as set forth in the state plan, is invalid because it was never promulgated as a rule as required by the Michigan Administrative Procedures Act (MAPA), 1969 P.A. 309, M.C.L.A. § 24.201 *et seq.;* M.S.A. § 3.560(101) *et seq.* DDS concedes that the prospective reimbursement system was not promulgated under MAPA. However, DSS counters that such promulgation was not required due to two administrative law concepts: permissive statutory power and adoption by reference.

The section of MAPA crucial to a discussion of permissive statutory power is M.C.L.A. § 24.207; M.S.A. § 3.560(107) which reads in relevant part:

Sec. 7. 'Rule' means an agency regulation, statement, standard, policy, ruling or instruction of general applicability, which implements or applies law enforced or administered by the agency, or which prescribes the organization, procedure or practice of the agency, including the amendment, suspension or rescission thereof, but does not include the following:

\* \* \* \* \* \*

(j) A decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected thereby.

Under Subsection (j), where an agency policy follows from its statutory authority, the policy is considered an exercise of a permissive statutory power and not a rule requiring formal adoption. *Village of Wolverine Lake v. State Boundary Commission,* 79 Mich.App. 56, 261 N.W.2d 206 (1977); *Colombini v. Director, Department of Social Services,* 93 Mich.App. 157, 286 N.W.2d 77 (1979); *Hinderer v. Department of Social Services,* 95 Mich.App. 716, 291 N.W.2d 672 (1980).

In *Hinderer,* the Michigan Court of Appeals held the permissive statutory power exception applicable to DSS' implementation of its lag budgeting system (LBS).[20] The Court reasoned as follows:

**20.** The lag budgeting system (LBS) involves the payment of AFDC grants to recipients based on

We find the administration of the AFDC program and the use of LBS thereunder to be tantamount to the exercise *vel non* of a permissive statutory power. As noted in *Village of Wolverine Lake v. State Boundary Comm,* 79 Mich App 56, 59; 261 NW2d 206 (1977), if an agency policy (here LBS) follows from its statutory authority, the policy is an exercise of a permissive statutory power and not a rule requiring formal adoption. Accord, *Colombini v. Director, Dep't of Social Services,* 93 Mich App 157; 286 NW2d 77 (1979). We find necessary statutory authority to be contained in MCL 400.14(1)(b); MSA 16.414(1)(b), as we read it to empower the defendant to adopt, for purposes of dispersal of AFDC benefit payments, a budgetary method of the director's own choosing, so long as it comports with Federal statutes and regulations. We have already concluded that LBS surmounts this Federal obstacle.

Since the use of LBS follows directly from this statutory authority, the policy (LBS) is an exercise of a permissive statutory policy, and is excepted from formal adoption and promulgation under the APA. Therefore, LBS is valid in its entirety.

95 Mich.App. at 726–27, 291 N.W.2d 672.

The Ingham County Circuit Court recently relied on the reasoning enunciated in *Hinderer* to decide the issue before this Court. *Verdries Nursing Home, Inc. v. Dempsey,* No. 80–25097 (Ingham County Circuit Court 1981). The *Verdries* Court held that DSS was not required to promulgate the prospective reimbursement program as a rule under MAPA. It reasoned that the 1977 and 1978 Appropriations Acts expressly authorized the director of the DSS to act; therefore, the actions of the director with regard to the prospective system constitute an exercise of a permissive statutory power:

It is the opinion of the Court that the (j) exception of Section 7 is applicable in

the instant matter. The 1977 and 1978 Appropriations Acts expressly authorize the Defendant to act. The Defendant's actions in abiding by the Plan are an exercise of a permissive statutory power. Thus, the Defendant need not promulgate the prospective reimbursement structure as a rule.

Supra at 796–97.

■■■■ This Court is similarly persuaded that the permissive statutory power exception encompassed by Subsection (j) of M.C.L.A. § 24.207 is applicable to the prospective reimbursement system. M.C.L.A. § 400.105; M.S.A. § 16.490(18) enables the appropriate state department to establish and administer a program for medical assistance for the indigent. M.C.L.A. § 400.-109; M.S.A. § 16.490(19)(c) enables the state to pay for nursing home care. In making payments for care, the state department must comply with the reimbursement formulas set forth in the Appropriations Acts. *County of Ingham v. Department of Social Services,* 62 Mich.App. 683, 684, 233 N.W.2d 833 (1975). The 1978 Act provides:

Nursing home services shall be reimbursed in accordance with the state plan for reimbursement of long term care facilities under title 19 of the social security act, 42 USC 1396 to 1396k, as approved by the department of health, education, and welfare.

1978 P.A. 401 § 49. The reimbursement procedures are set forth in full in attachment 4.19–D of the state plan.[21]

■■■ In the view of this Court, the cited legislation constitutes statutory authority empowering the DSS to establish and administer a program for Medicaid assistance, so long as that program comports with federal statutes and regulations. The Court has previously concluded that the prospective reimbursement system surmounts the federal obstacle. Therefore, as the prospective reimbursement system follows from

---

income received two months prior to the grant payment.

**21.** M.C.L.A. § 400.105 and M.C.L.A. § 400.109 were amended in 1980. Attachment 4.19–D of the state plan is revised annually. The revisions do not alter the foregoing discussion.

statutory authority, it is excepted from formal adoption and promulgation under MAPA.[22]

Having determined that the prospective reimbursement system was not required to be promulgated as a rule due to the doctrine of permissive statutory authority, the Court need not address the concept of adoption by reference.

### VII. *The Provider Agreement*

Park argues that DSS breached the terms and conditions of the provider agreement. DSS asserts that Park entered into the provider agreement as a condition of participation in the Medicaid program; further, that by signing the agreement Park has contractually agreed that it will abide by and be bound by the state's reimbursement policies.

The provider agreement is an arms-length business contract which forms the basis of the relationship between the nursing home and the state. Whatever rights a provider has arise exclusively from this agreement. *Green v. Cashman,* 605 F.2d 945, 946 (6th Cir.1979); *Briarcliff Haven, Inc. v. Department of Human Resources,* 403 F.Supp. 1355, 1364 (N.D.Ga.1975).

Participation by an LTCF as a provider of health care services to Medicaid recipients is voluntary. However, where a LTCF agrees to participate, it is required to accept payment in accord with the provisions of the state plan. *Briarcliff,* 403 F.Supp. at 1364. The legislative history of Title XIX is quite clear that the intent behind Medicaid was to aid the patients and clients of LTCFs; not to aid LTCFs or protect them from the consequences of their own business decisions. *Green,* 605 F.2d at 946; *Case v. Weinberger,* 523 F.2d 602, 607 (2d Cir.1975); *Paramount Convalescent Center v. Department of Health Care Services,* 15 Cal.3rd 489, 496–97, 125 Cal.Rptr. 265, 542 P.2d 1 (1975).

Park signed a provider agreement with the State of Michigan in March of 1977 and every year thereafter. The provider agreement states that reimbursement under the Medicaid program shall be in accordance with established state and federal reimbursement policies and subject to such conditions for reimbursement as may be established by law. It further states that the provider agrees to accept direct payment, from the state, as payment in full, by the recipient, for services received, and agrees not to seek additional or supplemental payments from the recipient, or his representative, for authorized services provided and paid for under these programs.

The prospective reimbursement system is fully set out in the state plan.[23] Park had the option, of course, as do all LTCFs who find reimbursement rates insufficient, of terminating its relationship with Medicaid. *Briarcliff,* 403 F.Supp. at 1363. Park cannot, however, voluntarily enter into an arms-length business contract year after year and then request the Court to alter the terms of that contract, particularly where such terms are not in violation of any federal law. As noted by the Northern District of Georgia in a similar situation, the "[provider] is asking the Court to immunize it from the risks and consequences of its business decisions, and this the Court cannot do." *Briarcliff,* 403 F.Supp. at 1364.

### VIII. *Equal Protection and Due Process*

Park argues that the manner of formulation of the plant cost limit of the prospective reimbursement system denies it equal protection and due process under the law. Generally, Park asserts that the implementation of the escalating plant cost limit for new construction or sales denies it equal protection; further, that the "arbitrary and

---

**22.** The Social Welfare Act as amended by 1980 P.A. 321 § 111a, effective December 12, 1980, provides additional statutory authority and instruction to the state. DSS formally adopted the § 111a guidelines on January 29, 1982.

**23.** Principles incorporated into a contract with a state agency need not necessarily be first promulgated as rules. *See, Greenfield Construction Co. v. Department of State Highways,* 58 Mich.App. 49, 227 N.W.2d 223 (1975), *aff'd,* 402 Mich. 172, 261 N.W.2d 718 (1978).

capricious" manner in which DSS computed the plant cost limit denies it due process of law.

Specifically, Park raises the following challenges to actions taken by DSS in developing the plant cost limit as violative of both equal protection and due process. First, DSS assumed that 75% financing was prudent and disallowed from its consideration of historical costs any portion of interest or financing in excess of 75%. Second, DSS made no distinctions in assumptions with regard to profit versus non-profit facilities. Third, DSS applied the plant cost limit on a state-wide basis and relied on the USDCCCI index to adjust for inflation. Fourth, DSS utilized unaudited data. Fifth, DSS assumed that facilities would consistently have 100% occupancy. Sixth, DSS developed alternate limits applicable to facilities sold or transferred after July 1, 1978 and to facilities constructed after July 1, 1978.

■ In terms of a substantive due process analysis, the Court must determine whether the challenged legislation seeks to achieve a legitimate government purpose, uses means that are rationally related thereto, and is neither arbitrary nor unreasonable in its effect. *Nebbia v. People of the State of New York,* 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940 (1934); *Matter of Joyner,* 7 B.R. 596, 599 (Bkrtcy.M.D. Ga.1980).[24]

As for the equal protection claim, this Court is guided by the Supreme Court's decision in *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), that in the area of economics and social welfare a state does not violate the equal protection clause if the legislation at issue is drawn on the basis of criteria rationally related to its objective. *Madison v. Mississippi Medicaid,* 86 F.R.D. at 184; *Massachusetts General Hospital v. Weiner,* 569 F.2d at 1160–61; *Yaplater v. Bates,* 494 F.Supp. 1349, 1368 (S.D.N.Y.1980), *aff'd,* 644 F.2d 131 (2nd Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1255, 71 L.Ed.2d 447.

■ The Court finds the plant cost limit of the prospective reimbursement system valid under the equal protection and the due process clauses of the United States Constitution. The prospective reimbursement system seeks to establish a monetary ceiling above which a LTCF may not be reimbursed for allowable plant costs. The system is based on an econometric premise which holds that public sector regulated oligopolies and monopolies, such as the nursing industry, should be put at risk in order to approximate the free market economy, obtain efficiencies and contain costs. The purpose of the system is to reimburse only the costs of an economically constructed and prudently financed facility. Such a purpose is clearly legitimate, as reflected in the legislative history of Title XIX, 42 U.S.C. § 1396 *et seq.*[25] *See also, Madeline Marie,* 694 F.2d at 442–443.[26]

Further, the testimony presented at trial, particularly that of Steven Potash and Ste-

---

**24.** At oral argument, counsel for Park asserted that he was raising procedural, as well as substantive, due process claims. However, Park's findings of fact and conclusions of law merely assert that "Park is entitled to due process of law in connection with matters affecting reimbursement and participation in Medicaid."

Park's Proposed Findings of Fact and Conclusions of Law at 9.

Due process is flexible and requires only those procedural protections as the particular situation demands. *Morrisey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1971). Park has failed to raise a procedural due process argument which merits further attention, particularly since we have already determined that the prospective reimbursement method was not

required to be promulgated as a rule under MAPA.

**25.** *See,* discussion *supra* at 796–97.

**26.** The Sixth Circuit set forth three purposes of a prospective system, the latter two of which are applicable to the present case:

... (b) to allow both the state and the provider to know in advance their budgetary requirements; and (c) to eliminate the inherent disadvantages of a "cost plus" system with its tendency of encouraging inefficiency and injecting uncertainty in the provider who must wait to find out whether his expenditures for services might later be deemed unreasonable and, thus, unreimburseable.

694 F.2d at 443.

ven Scheer, convinces the Court that the formulation of the plant cost component of the prospective reimbursement system is rationally based. The Court relies on the following facts as the foundation for its conclusion. First, the plant cost limit was based on a survey of 17 recently constructed nursing homes. Second, the data collected in the survey was correlated and the various component factors were independently reviewed:[27] the depreciation expense factor was made reasonable by calculating the "consolidated-composite asset total" according to standard IRS guidelines; the interest and finance expense factors were made reasonable by comparing the behavior of private corporations to that of persons operating nursing care facilities;[28] the property tax calculation was made reasonable by accounting for an inflation factor. Third, 95% of the facilities surveyed had a plant cost less than the $5.36 ppd limit adopted.[29] Fourth, DSS' decision to finalize reimbursement for the plant cost limit for facilities constructed and certified for occupancy prior to July 1, 1978, was rational as the plant costs of such facilities were fixed. Fifth, the creation of a second category of plant cost limits for facilities constructed after July 1, 1978, was rational as such facilities incur greater plant costs than homes constructed prior to that date; similarly, the creation of a third category of plant cost limits for facilities sold after July 1, 1978 was rational as the interest component of those facilities is altered upon sale.

Finally, the Court notes that Park has failed to show that the plant cost limit has either an arbitrary or an unreasonable effect. Rather, the evidence indicates that Park was not economically constructed or prudently financed. Indeed, with its pre-July 1978 accumulated deficit of $1.2 million, Park would have trouble functioning as an economically viable enterprise under most reimbursement systems.

 The fact that a system of reimbursement may be under-inclusive with respect to individual providers, does not render that reimbursement mechanism in violation of the Constitution. Moreover, it is not the function of the Court to attempt to determine whether a given state welfare policy is wise or the best solution. *Bates,* 494 F.Supp. at 1368. Rather, where, as in the present case, the legislature or the executive have acted in accord with their statutory authority and their judgment is supported by a rational basis, the Court is compelled to uphold that judgment.

This is not to imply that the system DSS has developed is the one the Court would implement, had it that option. It is rather to conclude that the plant cost limit of the prospective reimbursement system, as developed and implemented by DSS, is not in violation of the Social Security Act, the Michigan Administrative Procedures Act, the state provider agreement or the Equal Protection or Due Process Clauses of the United States Constitution.

27. Hence, nursing homes were not singled out by name or class with respect to full reimbursement entitlement.

28. See, for example, the reasoning behind the 75% debt-asset ratio limit:

In markets with no outside interference (e.g., no government intervention), lenders require varying amounts of "front money" in the financing of businesses. Receiving front money has the effect of both reducing periodic finance costs and also reducing "cavalier" use of the lender's money. The net effect is to diminish both the probability of default and the probability of less than full repayment in the event of default.

It is evident in the nursing care industry that lenders allow up to 90% of assets (up to

100% or greater is not unheard of). This is primarily due to the fact that the government has a stake in the industry, making it appear to have a little more stability. In the typical industries though, much more front money is required. The allowance of a 75 percent Debt-Asset ratio limit to borrowings is a generous figure, but not so high as to encourage excess borrowing.

Department of Social Services Memorandum, p. 5.

29. Further, there has been no showing that the cost for the construction of a non-profit facility differs from the costs for the construction of a proprietary nursing home.

Therefore, for the reasons set forth in the foregoing findings and conclusions, the relief requested by Park is DENIED.

So ordered.