Sylvester Sutton, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued March 3, 1982, before Judges ROGERS, CRAIG and MACPHAIL, sitting as a panel of three.

*Nancy Schuster,* for petitioner.

*Gary Goldman,* Assistant Counsel, for respondent.

OPINION BY JUDGE ROGERS, May 12, 1982:

The appellant, Sylvester Sutton, is an 80-year-old resident at Centennial Springs Health Care Center, a skilled care nursing home located at Warminster, Pennsylvania. He was admitted to Centennial in August, 1979. In June or July of 1980, he was hospitalized for surgery and the placement of a pacemaker and afterwards readmitted to Centennial in July, 1980. His care at Centennial is paid by his Social Security allotment and by contributions of the Department of Public Welfare through the Medical Assistance Program, the costs of which program is shared by the Federal and State governments.

In October, 1980 Centennial's Utilization Review Committee recommended that the level of nursing care provided Mr. Sutton should be reduced from skilled to intermediate. As required by regulation, the Bucks County Board of Assistance, as agent for the appellee State Department of Public Welfare, reviewed Centennial's recommendation and on November 12, 1980 notified Mr. Sutton that his level of care would be changed from skilled to intermediate on November 24, 1980. On November 19, 1980, Centennial sent to Jean Davis, Mr. Sutton's daughter and the person acting in his behalf, written notice of the change in the level of care to be provided to her father, from skilled to intermediate. This latter notice also reminded Ms. Davis that Centennial was a skilled nursing facility which did not accept Intermediate Medical Assistance patients, with the obvious, although not expressly stated, consequence that Mr. Sutton's residence would have to be changed.

Ms. Davis, in behalf of Mr. Sutton, filed an appeal from action of the County Board of Assistance chang-

ing the level of her father's classification of care. A hearing was thereupon conducted by a Department of Public Welfare Hearing Examiner at which Jean Davis appeared for her father, with legal counsel. The Hearing Examiner dismissed the appeal and the Department of Public Welfare by final administrative action affirmed. This appeal by Mr. Sutton followed.

The evidentiary hearing consisted for the most part of the admission of Mr. Sutton's case records at Centennial, consisting in the main of his medical records. Mr. Sutton's counsel made it clear at the hearing that an important ground of her client's appeal was the contention that Centennial, the skilled nursing facility (referred to in Federal regulation as the SNF), had not maintained a Discharge Plan for Mr. Sutton and that its Utilization Review Committee had not, therefore, reviewed his Discharge Plan—both requirements of Federal law; and that his imminent discharge to intermediate care without reference to a Discharge Plan was contrary to law.

If a state chooses to participate in the Medical Assistance program, as Pennsylvania has, it must follow the Federal Medical Assistance statutes and applicable Federal regulations. *White v. Beal,* 555 F.2d 1146 (3rd Cir. 1977).

The statute in question is Title XIX of the Social Security Act, 42 U.S.C. §§1396-1396m (1976 & Supp. III 1979). The Act requires a State Plan for Medical Assistance to provide methods and procedures to prevent unnecessary utilization and to promote economy in the Medicare program, 42 U.S.C. §§1396a(a)(28) and 1396a(a)(30).

The regulations concerning utilization control are found at Part 456 of Title 42 of the Code of Federal Regulations. Included within Part 456 is a topic "Discharge Plan" at 42 C.F.R. §§456.346-456.348 (1981). These Sections of regulations are as follows:

§456.346   Discharge plan.

(a)   The UR [Utilization Review] committee must review each recipient's discharge plan.

(b)   Each discharge plan must insure that the recipient has a planned program of post-discharge continuing care that takes his needs into account.

§456.347   Discharge planning procedures.

Each SNF [Skilled Nursing Facility] must maintain discharge planning procedures that describe the following:

(a)   The staff member of the SNF or the health, social, or welfare agency responsible for discharge planning.

(b)   The authority of the member or agency, and the methods used in discharge planning including the relationship with the SNF's staff.

(c)   The time allowed for determining each recipient's need for discharge planning. The period must not be longer than 7 days after the day of admission.

(d)   The period after which each recipient's discharge plan will be reevaluated.

(e)   The local resources available to the SNF, the recipient, and the attending physician to assist in developing and implementing discharge plans.

(f)   The provisions for periodic review and reevaluation of the SNF's discharge planning program.

§456.348   Information about discharged recipients.

(a)   When a recipient is discharged, the SNF must provide information that will insure the optimal continuity of care, such as—

(1) Current information relative to diagnoses;

(2) Prior treatment;

(3) Rehabilitation potential;

(4) Physician advice concerning immediate care; and

(5) Pertinent social information.

(b) This information must be provided to those persons who are responsible for the recipient's post-discharge care.

The record plainly shows that Centennial maintained nothing resembling a Discharge Plan for Mr. Sutton so that of course its Utilization Review Committee did not and could not review a Discharge Plan in making its recommendation that his classification be changed, with the consequence of his being removed from Centennial to intermediate care. In consequence, we are compelled to reverse the Department of Public Welfare's order.

The only thing in the record bearing the name "Discharge Plan" is a note appearing at the end of a form titled "Medical Care Plan" prepared in August of 1979, more than fifteen months before Centennial's Utilization Review Committee instituted the review which resulted in the classification change which is the subject of these proceedings. This so-called discharge plan reads with regard to Mr. Sutton under the heading "Assessment", "probable permanent placement" and under the heading "Recommendations", "no discharge anticipated."

The Department of Public Welfare first contends in support of its action that discharge planning is irrelevant because the only thing involved in changing Mr. Sutton's level of care was an evaluation of his current medical needs and that planning for his discharge could follow the medical evaluation. This argu-

ment is clearly without merit. The review being made by a Utilization Review Committee looked toward a change in Mr. Sutton's level of care and his removal from Centennial to less expensive care; it was not merely a medical review. Indeed, Centennial's letter of November 19, 1980, to which we have earlier referred, notified Mr. Sutton's daughter that since Centennial was a skilled nursing facility it could not continue her father's stay.

The Department of Public Welfare next says that even if discharge planning was required as we have concluded that it was, the regulations concerning discharge planning were intended to protect "the State and Federal treasuries, not the patient." Nothing could be farther from the fact. 42 C.F.R. §456.346(b) says that the purpose of discharge planning is to assure that the recipient has a planned program of needed post-discharge care.

The Department of Public Welfare also argues that Mr. Sutton did not prove that in fact Centennial did not maintain a Discharge Plan. The records of the Utilization Review Committee introduced into the evidence by the Department of Public Welfare contain no evidence of any consideration of a Discharge Plan; the records included as the only evidence of any discharge planning a notation made fifteen months prior to the review to the effect that Mr. Sutton would likely be a permanent resident at Centennial. Moreover, the County Board's caseworker when questioned by Mr. Sutton's attorney said that the county knew of no documents relating to discharge other than those placed in the record—to wit, none.

We therefore reverse the Final Administrative Order and vacate the decision of the Bucks County Board of Assistance changing Mr. Sutton's level of care; without prejudice, however, to the right of Centennial Springs Health Care Center and the Depart-

ment of Public Welfare to undertake a new Utilization Review concerning Mr. Sutton conforming to law.

ORDER

AND Now, this 12th day of May, 1982, the Final Administrative Order of the Department of Public Welfare is reversed and the decision of the Bucks County Board of Assistance changing the appellant's level of care is vacated; without prejudice to the right of Centennial Springs Health Care Center and Department of Public Welfare to undertake a new Utilization Review concerning Mr. Sutton conforming to law.

This decision was reached prior to the resignation of Judge MENCER.