Minnie **TROUTMAN**, et al.

v.

Walter **COHEN**, et al.

Margaret **HOLLAND**, et al.

v.

Walter **COHEN**, et al.

Civ. A. Nos. 83–3534, 83–5983.

United States District Court,
E.D. Pennsylvania.

March 8, 1984.

---

Michael J. Campbell, Ann S. Torregrossa, Dana M. Breslin, Delaware County Legal Assistance, Chester, Pa., David Gates, Nancy Schuster, Bucks County Legal Aid Society, Bristol, Pa., for plaintiffs.

Samuel Kagle, Philadelphia, Pa., John G. Knorr, III, Sr. Deputy Atty. Gen., Harrisburg, Pa., for plaintiffs-intervenors.

Miriam L. Gafni, Philadelphia, Pa., for amicus intervenor.

Stanley I. Slipakoff, Asst. Counsel, Dept. of Public Welfare, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

VANARTSDALEN, District Judge.

### I.  *Introduction*

Plaintiffs in Civil Action 83–3534 filed a complaint on behalf of themselves and those similarly situated challenging the validity of the Pennsylvania Department of Welfare's recently adopted amendments to the regulations regarding skilled nursing care under Title XIX of the Social Security Act (commonly called Medicaid), 42 U.S.C. § 1396–1396p.  The gravamen of plaintiffs' complaint is that the state's new definition of skilled care is impermissibly stricter than that provided by federal law, thus resulting in the reduction in the level of nursing care to thousands of low income elderly nursing home patients.  Subsequent to the filing of the complaint in Civil Action 83–3534, a related action was filed and assigned to me under our local rules.  This later case, *Holland v. Cohen,* Civil Action 83–5983, challenges the same regulations but the crux of the complaint is directed at various alleged infirmities in the administrative hearing process by which patients can challenge adverse decisions regarding the level of care to which they are entitled under state and federal law.

Presently before the court is plaintiffs' application for a preliminary injunction which seeks an order directing defendants to continue certain interim measures that recently expired which, in effect, had allowed reimbursement to nursing homes for both skilled care and intermediate care patients at the skilled care rate and increased certain reimbursement ceilings.

### II.  *Background*

The Medicaid program is a cooperative federal-state program set up to provide medical services to the poor.  It is a system for federal funding of state plans to furnish health care to needy persons through agreements with private and public individuals and institutions capable of providing

those services. *Harris v. McRae*, 448 U.S. 297, 308–09, 100 S.Ct. 2671, 2683–84, 65 L.Ed.2d 784 (1980). The program was created in 1965 when Congress added Title XIX to the Social Security Act, 79 Stat. 343, as amended, 42 U.S.C. § 1396–1396p, for the purpose of providing federal financial assistance to states that chose to reimburse certain costs of medical treatment for needy individuals. *Id.* at 301, 100 S.Ct. at 2680. Participation in the Medicaid program by the individual states is entirely optional. When a state chooses to participate, it must comply with the requirements of Title XIX.

Once a state elects to participate, it must submit a plan which, in order to be approved by the Secretary of Health and Human Services (Secretary), must conform to the extensive specific requirements set forth in 42 U.S.C. § 1396a(a). One such requirement is that a participating state must provide financial assistance to the "categorically needy," [1] with respect to five general areas of medical treatment. One of the five mandatory services, and the only one involved in these actions, is skilled nursing facility services. 42 U.S.C. § 1396a(a)(10)(A). Although Title XIX does not require states to provide funding for all medical treatment falling within the five general categories, it does require that state plans establish "reasonable standards ... for determining ... the extent of medical assistance under the plan which ... are consistent with the objectives of [Title XIX]." 42 U.S.C. § 1396(a)(17). Further, the state plan must provide:

> For payment of the ... skilled nursing facility, and intermediate care facility services provided under the plan through the use of rates ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide

care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards. 42 U.S.C. § 1396a(a)(13)(A).

In addition to the five general categories of treatment required to be provided, the state can elect to provide, and the federal government will contribute funding for, other medical services. One such optional service involves the providing of intermediate nursing care facilities for patients whose condition does not require the skill and care of a skilled nursing facility.[2]

The Secretary is also authorized to establish regulations regarding the Medicaid program. 42 U.S.C. § 1302. While the states retain substantial discretion in administering the program, they must adhere to the dictates of Congress in the operation of the program under Title XIX and to the Secretary's regulations. *Smith v. Miller*, 665 F.2d 172, 174 (7th Cir.1981).

The regulations governing skilled nursing facilities are located in Chapter IV of Title 42 of the Code of Federal Regulations. Title 42 is the Public Health title and Chapter IV deals with the Health Care Financing Administration (HCFA), the agency delegated the authority to administer the Medicaid program.

Pennsylvania has elected to join the optional Medicaid program. As such, it has filed a state plan and as mandated by federal law, has named the Pennsylvania Department of Public Welfare (DPW) as the single state agency "to administer or supervise the administration of the plan." 42 U.S.C. § 1396a(a)(5). The applicable Pennsylvania statutes are located at Pa.Stat. Ann. tit. 62 §§ 101–1503 (Purdon's 1982) and 55 Pa.Admin.Code § 1101.11–.95 (Shepard's 1983). More specifically, Pennsylvania has created the Pennsylvania Medical Assistance Program which provides for both skilled and intermediate care facilities. Pa.Stat.Ann. tit. 62 §§ 443.4, 444.1; 55 Pa.

---

**1.** *See* 42 U.S.C. § 1396a(a)(10)(A) for the categories which qualify.

**2.** For definitions of intermediate care facility and skilled nursing facility *see* 42 U.S.C.

§ 1396d(c), (d) & (f); 42 C.F.R. § 409.31 & .32 (1983) formerly 42 C.F.R. § 405.127 & .128 (1982). The regulations were recently reclassified. *See* 42 Fed.Reg. 12544 (1983).

Admin.Code § 1101.11–.95. With this general background as a preface, the specific facts which resulted in the present litigation are next set forth.

### III. *Facts*

On January 8, 1983, DPW published a new set of regulations concerning skilled nursing facilities and intermediate care facilities in the Pennsylvania Bulletin. 13 Pa.Admin.Bull. 151 (1983). Prior to January 8, 1983, DPW defined skilled nursing care as:

> A level of care ordered by and provided under the direction of a physician. Skilled nursing care is provided on a continuous 24 hour basis for a person who requires the professional and specialized technical administration of nursing and rehabilitative services, or skilled observation when a medical determination may be required. When the inherent complexity of a prescribed service is such that it must be performed by professional or technical personnel only, in order to insure the safety or effectiveness of the service, this constitutes a skilled procedure. (Examples of skilled nursing services are included in the Provider Handbook.)

11 Pa.Admin.Bull. 2612 (1981). DPW maintains that the regulations were changed as a result of a 1980 audit by federal officials of the Allegheny County Nursing Home, a large county-operated nursing home located just south of Pittsburgh. The Allegheny County Nursing Home provided skilled nursing care for DPW under Medicaid and the federal government under Medicare. Evidently, the auditors discovered that in certain cases physicians were able to qualify patients for skilled care under Pennsylvania's Medicaid regulations who would not qualify under Medicare, controlled by federal regulations.

The auditors, understandably concerned, pointed out to DPW that the Medicare and Medicaid definitions were supposed to be the same under the federal statute. Based upon the federal audit DPW agreed to return $118,000 in federal monies and to change DPW's regulations to conform with federal law.

On January 8, 1983, the culmination of several years' work was published in the Pennsylvania Bulletin. The definition of skilled nursing care was replaced by a definition of skilled nursing facility services:

> *Skilled nursing facility services* —Skilled nursing and rehabilitation services which:
>
> (i) are ordered by and under the direction of a physician;
>
> (ii) are provided either directly by or under the supervision of medical professionals—registered nurse, licensed practical nurse, physical therapist, occupational therapist, speech pathologist, or audiologist—as defined in 42 C.F.R. § 405.1101(c), (k), (m), (q), (t);
>
> (iii) are required and provided on a·daily basis as defined at 42 C.F.R. § 405.-128;
>
> (iv) can only be provided, as a practical matter, on an inpatient basis as discussed at 42 C.F.R. 405.238a; and
>
> (v) are provided in accordance with the Medicare requirements set forth at 42 C.F.R. §§ 405.127, 405.128, and 405.-128(a) by a facility or distinct part of a facility that is certified to meet the requirements for participation at 42 C.F.R. Part 442, Subpart C, as evidenced by a valid agreement with the Department for providing skilled nursing facility services and making payments for those services.

55 Pa.Admin.Code § 1181.2 (Shepard's 1983). In addition, Appendix E, relating to skilled nursing care assessment, was added to the regulations. Appendix E specifies the minimum medical care criteria a patient must meet in order to be determined medically eligible for skilled nursing care. Appendix E also contains a description of the general categories of skilled care services and the prerequisites of each. Finally, a list of specific services that comprise the general categories is included in the appendix. While plaintiffs have challenged the definition of skilled nursing facility services, it is really Appendix E that is being challenged.

Perhaps recognizing the serious impact the new stricter regulations would have on the institutions involved,[3] DPW agreed to certain interim measures that would reduce the adverse financial impact on the institutions. From January 8, 1983 through December 31, 1983, DPW agreed to recognize for reimbursement purposes, an average of 2.5 nursing hours plus 20% per day for a skilled care patient and 2.0 nursing hours plus 50% per day for an intermediate care patient as the maximum nursing staff allowance. In effect, for the year 1983, a participating nursing home could be reimbursed the same amount per patient for both skilled and intermediate care (3.0 hours). In addition, DPW agreed to raise the reimbursable ceiling rate for intermediate care by 6%. These interim measures expired December 31, 1983. Plaintiffs seek a preliminary injunction to have these interim measures reinstated pending final disposition of the litigation.

### IV. *Procedural History*

On July 26, 1983, the named plaintiffs filed a class action complaint for declaratory and injunctive relief. The named defendants are Walter Cohen, Gerald Radke and Patricia O'Neal, the Secretary, Deputy Secretary for Medical Assistance and Acting Director of the Office of Hearings and Appeals of the Pennsylvania Department of Public Welfare, respectively.

Plaintiffs' complaint challenges DPW's new regulations under the United States Constitution, federal statutes and regulations because (1) the new regulations improperly and illegally restrict plaintiffs' entitlement to skilled nursing care and are inconsistent with the federal criteria; (2) the new criteria are arbitrary and capricious with no standard or equal application, which violates equal protection; (3) the defendants have withheld publication of the rules and regulations in violation of due process and the Pennsylvania Documents law; and (4) lack of an appropriate system of review of a determination of an individual patient's level of care entitlement as mandated by federal law.

Count I of the complaint alleges that DPW's regulations are not in compliance with the federal regulations because DPW "failed to include as skilled services: (1) overall management and evaluation of care plan; (2) observation and assessment of patient's changing condition; (3) patient education services." *See* 42 C.F.R. § 409.-33(a)(1), (2) & (3). DPW's regulations are also alleged to be impermissibly stricter than the federal regulations because the definition of special medical complications includes the term "rare," and the regulations require daily documentation of the skilled nursing care provided.

Count II challenges the reevaluation procedure by which patients are being categorized under the new regulations. Plaintiffs allege that such decisions are being made in an arbitrary manner in violation of equal protection.

Count III charges that defendants have violated due process and Pennsylvania law because skilled care services are listed in a Skilled Nursing Care Assessment Handbook, which has not been properly published.

On July 22, 1983, four days before the complaint was filed, plaintiffs sought a temporary restraining order (1) to enjoin defendants from terminating named plaintiffs' skilled care and (2) directing defendants to continue providing nursing homes with reimbursement at the skilled nursing care level. At the hearing before me on July 25, 1983, the parties reached an agreement obviating any need for immediate relief.

On November 4, 1983, I granted plaintiffs' motion to certify a class consisting of all persons eligible to receive "medical assistance" and who are, or will be, receiving

---

**3.** There was testimony that prior to DPW's new regulations there were approximately 70% skilled care and 30% intermediate care patients in the Pennsylvania nursing homes participating in Medicaid. As a result of the changes, Pennsylvania estimated that its figures would be reversed: between 25 to 30% would be skilled care and 70 to 75% would be intermediate care patients after the new regulations were applied.

skilled nursing facility services or intermediate care facility services. The order provided that the action was certified as a class action only with respect to the issues of whether the regulations published on January 8, 1983 are invalid on their face and whether the regulations are invalid because of a defect in publication.

On December 16, 1983, another class action complaint was filed involving DPW's new regulations against the same named defendants as those involved in *Troutman v. Cohen*, Civil Action 83-3534. The second action, *Holland v. Cohen*, Civil Action 83-5983, basically challenges the administrative hearing procedure by which patients can contest adverse decisions regarding their reimbursable level of care.

At a pretrial conference held in my chambers on January 5, 1984, plaintiffs' counsel sought an agreement from the state that the new regulations would not go into effect until there was a final disposition of this case on the merits. Plaintiffs basically sought a continuation of the interim measures adopted and in effect from January 8, 1983 through December 31, 1983. Because no such agreement was reached, I set a hearing for January 11, 1984, on plaintiffs' application for a preliminary injunction and informed all counsel that I would hear evidence on any of the actions.[4] Evidence was presented during two days of hearings.

## V. *Standard of Review*

To determine whether to grant or deny an application for a preliminary injunction, the court must balance the equities. The focus is usually placed upon the following four criteria: (1) the probability of irreparable injury to the moving party in the absence of relief; (2) the possibility of harm to the non-moving party if relief is granted; (3) the likelihood of success on the merits; and (4) the public interest. *United States v. Price*, 688 F.2d 204, 211 (3d Cir.1982). Although this is only an application for a preliminary injunction and not a disposition

on the merits, in considering the "likelihood of success on the merits," consideration must be given to the standards that will be applicable in any final determination on the merits.

Congress, in passing the Medicaid statute, specifically contemplated allowing states wide discretion in implementing the program. The state agencies are authorized by statute to develop the state reimbursement plan. As the Fifth Circuit recently observed:

> The function and expertise of the federal courts in this sphere is limited, and our role does not extend to reweighing or rethinking the political and financial concerns behind a particular payment plan. A district court can, of course, decide whether federal law has been violated. Otherwise its review of nonadjudicatory federal agency action is limited to deciding whether the action is arbitrary or capricious. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 236 (1971); 5 U.S.C. § 706(2)(A). A presumption of validity attaches to agency action, and the burden of proof rests with the party challenging such action. *Alabama Nursing Home [v. Harris]*, 617 F.2d [388] at 393 [5th Cir.1980]. Although the answer is far from clear, we assume without deciding that by force of statutory or constitutional requirements, a district court is entitled to review the actions of a state agency administering federal Medicaid funding as it would review the actions of a federal agency.

*Mississippi Hosp. Ass'n, Inc. v. Heckler*, 701 F.2d 511, 516 (5th Cir.1983). The likelihood of plaintiffs' success on the merits must be considered with the above standards of review in mind.

## VI. *Discussion*

Any time the state or federal government attempts to reduce established public welfare benefits, litigation can be expected

---

**4.** In addition to the *Troutman* and *Holland* actions, there was a complaint filed on behalf of a group of intervenors and an amicus appearance

by District 1199c and District 1199p, National Union of Hospital and Health Care Employees.

to follow. This is particularly true where, as here, the benefits may adversely effect the physical and mental health and well-being of all persons whose benefits are reduced. The unfortunate plight of the elderly poor in this country confined in nursing homes is well known. *See, e.g., In Re Estate of Smith,* 557 F.Supp. 289, 292–95 (D.Col.1983). However, the issue in this litigation is confined to whether the challenged state regulations violate the federal constitution, statutes or regulations.[5]

The plaintiffs presented at the hearing a broadside attack against the challenged regulations raising multiple issues. There are probably two reasons for this: (1) plaintiffs' counsel's understandable concern for the welfare of their clients, and (2) at the pretrial conference held on January 5, 1984, I told counsel I would hear evidence on any of the claims in any of the actions. Although plaintiffs have raised various claims at different times (*e.g.,* in their pretrial brief, proposed findings of fact, motions and post-trial brief), I will, at this time, only address those claims upon which evidence was presented at the hearing and that has some bearing on whether a preliminary injunction should issue. In all fairness to plaintiffs, the claims, which I understand to be their primary contentions, have remained consistent throughout.

Plaintiffs' primary argument challenges the Pennsylvania regulations as being inconsistent with the mandated federal regulations because DPW's regulations do not contain certain provisions that are contained in the federal regulations and include others, not present in the federal regulations (this claim is essentially Count I of the *Troutman* complaint). The bulk of testimony and evidence presented at the hearing was concerned with this contention. Plaintiffs' second contention is that the method prescribed by the Pennsylvania regulations to determine reimbursable costs for skilled nursing facility services is inadequate in amount, duration and scope to effectuate the Medicaid plan, in violation of federal law. *See* 42 C.F.R. § 440.-230(b).[6] I will deal with each of these two claims separately.

A.  Pennsylvania's regulations as inconsistent with federal regulations.

The relevant federal regulations define skilled nursing and rehabilitation services. 42 C.F.R. § 409.31 (1983). They also provide examples of nursing services which qualify as skilled nursing services. 42 C.F.R. § 409.33(b). Pennsylvania has adopted these almost verbatim. 11 Pa.Admin.Code § 1181 Appendix E II(b)(i). The federal regulations also contain some examples of services which would qualify as skilled rehabilitation services. 42 C.F.R. § 409.33(C). Pennsylvania has also adopted these services as skilled. 11 Pa. Admin.Code § 1182 Appendix E II(b)(ii). A large portion of the dispute in this case focuses on a third group of examples. The federal regulations include a group which *would* qualify as skilled care but *could* be classified as either skilled nursing or skilled rehabilitation services. 42 C.F.R.

---

5. Any claims that the challenged regulations violate purely state statutes and/or state regulations may not be heard in this court. The eleventh amendment precludes federal courts ordering state officials to comply with purely state law. *Pennhurst State School and Hospital v. Halderman,* —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). If the conduct violates federal law as well as state law, state officials may, however, be enjoined prospectively. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1976); *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Plaintiffs do not seek monetary damages in this case.

6. Plaintiffs, in their opening argument, concentrated on the inconsistency argument, which is set out in the *Troutman* complaint. Most of their evidence addressed this argument. However, the reimbursable costs argument is contained in the *Holland* complaint. Plaintiffs specifically requested maintaining the interim measures in effect between January 8, 1983 through December 31, 1983, in a proposed preliminary injunction order filed with the court. Evidence was presented on this issue at the hearing. Any and all other issues raised by plaintiffs must be dealt with either at a later hearing or await the full trial on the merits. These include plaintiffs' lack of notice claims which counsel admitted would be left for another day in his closing, and upon which little or no evidence was presented at the hearing.

§ 409.33(a). These include (1) an overall management and evaluation of care plan, (2) the observation and assessment of the patient's changing condition and (3) patient education services. 42 C.F.R. § 409.-33(a)(1), (2) & (3). Unfortunately, Pennsylvania did not adopt the federal regulations almost verbatim as to this regulation. Pennsylvania instead chose to adopt the following provision:

A recipient may not need or receive a skilled care service specified in paragraphs (i) or (ii) of subsection (b), however, in rare instances, a particular medical condition may occur which complicates the recipient's medical state to the degree that the treatment of the recipient's medical condition must be rendered or supervised by medical professionals on a daily basis. Although any of the services required in the treatment of this condition could be performed by a properly instructed person, that person would not have the ability to understand the relationship between the services and to evaluate the ultimate effect of one service on the other. Therefore, the treatment of the medical condition requires that the services be performed by or under the immediate supervision of medical professionals. It is the necessity of the immediate involvement of medical professionals in the treatment of the recipient's special medical condition that qualifies the recipient to be determined medically eligible for skilled nursing care. In these cases, the special medical complication and the services which meet the criteria specified in section II(a) and are provided on a daily basis by medical professionals because of the recipient's special medical complication must be documented in the recipient's medical record by physician's orders and nursing or therapy notes.

11 Pa.Admin.Code § 1181 Appendix E II(C). Four of the plaintiffs' five claimed deficiencies in the state regulations [7] can be traced to the difference between section 409.33 of the federal regulations and the above-quoted Pennsylvania regulation.

Plaintiffs claim that the failure to specifically include an overall management and evaluation of care plan, the observation and assessment of the patient's changing condition and patient education services as qualifying for skilled care in the state regulations renders them invalid as nonconforming to federal regulation. Plaintiffs also contend that the inclusion of the term "rare" in the state's regulation also renders the regulation invalid. The state, on the other hand, maintains that the quoted state regulation encompasses all of the examples set out in the federal regulations and that the term "rare" describes, rather than limits, the right to be classified for skilled care.

Plaintiffs contend that the absence of any express reference to an overall management plan, a patient's changing condition and patient education services in the state regulations will preclude many patients, who would qualify for skilled care under the federal regulations, from so qualifying under the state regulations. Plaintiffs argue that the respective nursing homes caring for these patients will be forced as a practical financial matter to place them in the less intensive, intermediate care units, because nursing homes will be reimbursed for such patients only at the intermediate care rates which are less than the skilled care reimbursement rates.

Under the current regulations, effective as of January 1, 1984, a skilled care facility may be reimbursed up to the ceiling limit for 3 hours per day of nursing care per patient, whereas an intermediate care facility may only be allocated 2.4 hours per day of nursing care per patient. Although there are different ceilings applicable to skilled care facilities as opposed to intermediate care facilities, it is clear that where a patient, because of the new regulations is reclassified from being entitled to skilled care services to intermediate care services, the amount of nursing care that can be provided such patient for which the facility

---

7. *See supra* p. 594 for plaintiffs' five claims.

may receive reimbursement will be substantially reduced. Thus, plaintiffs correctly contend, that the probable, if not inevitable, result will be that the level of care will be likewise reduced, even though the individual patient needs will remain the same. The anticipated reduction in the level of nursing care that persons, entitled to skilled nursing care under the former regulations, will receive by reason of reclassification under the new regulations for intermediate care is the basis of the alleged harm or injury.

Plaintiffs presented expert testimony that, at least as to some of the named plaintiffs, the treating physicians would have qualified them for skilled care under one of the three federal criteria, yet there was no place to do so under the state regulations or on the state form.[8] Although on final adjudication it may be determined that the state regulations are facially deficient, I will not enter a preliminary injunction.

One of the state's primary defenses throughout has been that the new regulations were sent to and approved by the Health Care Financing Administration (HCFA), the agency in charge of implementing the Medicaid program. By approving the state plan, HCFA (and, by implication, the Department of Health and Human Services) has in effect expressed its view that the plan is in compliance with applicable federal statutory and regulatory requirements. *See Michael Reese Physicians & Surgeons, S.C. v. Quern*, 606 F.2d 732, 735–36 (7th Cir.1979), *cert. denied*, 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981) (citing *Quern v. Mandley*, 436 U.S. 725, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978)). Although the court must ultimately decide if the challenged regulations are valid, the interpretation by the agency charged with administration of the statute is entitled to substantial deference. *See id.* at 736 (citing *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973)). Approval by a regional director of the HCFA need not be given the same substantial weight as the official policy of HCFA. *See White v. Beal*, 555 F.2d 1146, 1152 n. 6 (3d Cir.1977). Approval by a regional office of HCFA is, however, entitled to some deference, and should be taken into consideration in determining the "likelihood of success."

1. Application of Preliminary Injunction Standards to Plaintiffs' Argument that DPW's Regulations are Inconsistent with Federal Regulations.

(a) Probability of irreparable injury to the moving party in the absence of relief.

Plaintiffs claim that the transfer from skilled care to the less intensive intermediate care level will lead to irreparable harm.

In large measure plaintiffs' claim rests on the proposition that whereas 70 percent of the medicaid nursing population was receiving skilled care under the old regulations, defendants estimate that only 25 to 30 percent will receive that care under the new regulations. Thus, plaintiffs argue, while the patients' needs have remained the same, their care is being improperly reduced. There are several difficulties with this contention. First, it assumes that all of the patients formerly receiving skilled care under Pennsylvania regulations were entitled to such care under the federal regulations. There was testimony that Pennsylvania's old regulations were much more liberal than the federal regulations and not in compliance with the federal regulations. There was also testimony to the effect that whereas the national average for the pro-

---

**8.** Plaintiffs are correct that the evidence on this point was uncontradicted. However, the evidence in this regard relates to the regulations *as applied.* The class was only certified on the issues of notice and facial validity. While the court would have the power, in certain circumstances, to reach the *as applied* issue with respect to the named plaintiffs, I have declined to do so, because none of the named plaintiffs have taken an appeal, permitted as of right, from the administrative hearing to the Commonwealth Court of Pennsylvania. *See* 42 Pa. Cons.Stat. §§ 763, 5105 (1981). *See also Sutton v. Department of Public Welfare*, 66 Pa.Commw. 460, 444 A.2d 1332 (1982).

portion of skilled care patients to intermediate care patients was 30 percent skilled care to 70 percent intermediate care, Pennsylvania's ratio was the reverse. Therefore, it is likely that there are a substantial number of patients who were qualified under the former state regulations for skilled care but whose needs under the applicable federal regulations would not qualify for skilled care. As to this group, there is no legal harm, even if there is in fact a reduction in the actual care they receive.

Further, although there was testimony that the less intensive care could lead to medical complications and inadequate treatment, there was no testimony that such has in fact occurred. If, as a result of the new changes, a portion of the nursing home population was to have all care shut off or dangerously reduced, there would be irreparable harm. However, the patients affected here will continue to receive at least intermediate care pending final disposition on the merits. There has been absolutely no testimony that the care provided at the intermediate level is not quality care (the argument is that the mere reduction in the level of care results in harm). There is no evidence that any individual patient has in fact suffered any ill effects or received medically deficient care. Should any patient's condition suffer as a result of the reduction in the level of care, the patient then becomes eligible for skilled care. While this is not an ideal situation and is the very problem plaintiffs seek to avoid, it does militate against the claim of irreparable harm.

A similar claim of irreparable harm was rejected in a case with facts closely analogous to the present case. In *Coalition of Michigan Nursing Homes, Inc. v. Dempsey*, 537 F.Supp. 451 (E.D.Mich.1982), the court denied an application for preliminary injunction by a group of nursing homes challenging certain cutbacks in the Michigan Medicaid program. In *Dempsey* the plaintiffs "urge[d] that reduced quality of care which the residents may suffer because the provider's funding is·reduced constitutes irreparable injury." *Id.* at 464. The court, recognizing that the nursing homes might have standing to raise the patients' rights, stated that the facts did not support a finding that the residents as a whole would be irreparably injured. The court explained in a footnote that "[a]n incremental reduction in the quality of care for a period of time does not constitute irreparable injury." *Id.* at 465 n. 45. In the present litigation although there is no question as to standing, I am also of the opinion that a reduction in the level of care does not constitute irreparable injury.

(b) Possibility of harm to the non-moving party if relief is granted.

There is clearly a possibility of harm to the non-moving party both financially and as administratively disruptive if a preliminary injunction would be improvidently granted. Because there will be no irreparable harm to the plaintiff class, the possible harm to defendants need not be balanced against the probability of harm to the plaintiffs. If the relief requested would be granted, defendants would be forced to expend substantial sums of state and federal money to carry out the order. As plaintiffs are proceeding in forma pauperis, there is no way to guarantee protection by posting an injunction bond. Should the regulations ultimately be upheld or only partially stricken, there would be no way to recover the sums expended. If there existed a reasonable likelihood of physical harm to plaintiffs, such harm would probably outweigh any financial harm to the public. I have, however, determined there is no threat of irreparable harm and no such balancing need be undertaken.

(c) Likelihood of success on the merits.

The Pennsylvania regulations may ultimately on a full trial be declared invalid on their face to the extent that the Pennsylvania skilled nursing care regulations fail to expressly include an overall management of care plan and patient's changing condition as qualifying a patient for skilled care. Even if this constitutes a defect in the Pennsylvania regulations, this does not, considering all the circumstances, warrant

granting a preliminary injunction. As written, the DPW regulations arguably do encompass patients who fit into these two categories as qualified for skilled nursing care services. Thus, while these categories probably should be expressly included by specific reference in DPW's regulations, considering all the equities, a preliminary injunction is not appropriate.

Pennsylvania's regulations provide for skilled nursing care where there are "special medical circumstances." The Pennsylvania special medical circumstances provision provides in relevant part that "[a] recipient may not need or receive a skilled care service specified in paragraphs (i)(ii) of subsection (b); however, in rare circumstances, a particular medical condition may occur which complicates the recipient's medical state to the degree that the treatment of the recipient's medical condition must be rendered or supervised by medical professionals on a daily basis." 11 Pa.Admin.Code § 1181 Appendix E II(c). The federal regulations provide that skilled services are appropriate "when, because of the patient's physical or mental condition, those activities require the involvement of technical or professional personnel in order to meet the patient's needs, promote recovery, and ensure medical safety." 42 C.F.R. § 409.33(a)(1). The federal regulations also state that skilled services are appropriate "when the skills of a technical or professional person are required to identify and evaluate the patient's need for modification of treatment for additional medical procedures until his or her condition is stabilized." 42 C.F.R. § 409.33(a)(2).

Both the state regulation and the two federal regulations are concerned with special circumstances which require treatment by professionals. The federal regulations specify particular situations where that may occur, namely the overall management of care plan and observation of a patient's changing condition. The state does not provide these specific examples within the general provisions. While the state may ultimately be required to include the specific references, the fact that there is a general provision into which such circumstances

may fit militates against preliminary injunctive relief. The state's apparently substantial compliance may finally be determined to be inadequate but, at this stage of the proceedings is sufficient to withstand an application for preliminary injunction.

The federal regulations also include a reference to patient education services. 42 C.F.R. § 409.33(a)(3). DPW's Medical Assistance Skilled Nursing Care Assessment Form Handbook defines "rehabilitative nursing procedures" to include "the *institution, teaching,* and supervision of any *training* program, or any patient education service provided on a daily basis." (emphasis in original). Clearly, the state regulations square with federal requirements on this point and there is no likelihood of success on the merits.

Plaintiffs also contend that the inclusion of the word "rare" in the state's special medical complications provision renders the state regulations facially invalid. I find this argument unpersuasive. The word "rare" merely describes the frequency with which such circumstances are expected to occur, not as a limit upon the number of times there may be special circumstances that qualify for skilled care. Because the special medical complications provision is in addition to the enumerated circumstances for which skilled care is appropriate, it is reasonable to assume such circumstances occur infrequently. Again, although the word "rare" might preferably have been omitted from the regulation, it would not make the regulation *facially* invalid.

Plaintiffs' claim that the state's requirement that the patient's record be documented daily renders the regulations facially invalid must also fail. It is undisputed that under the federal regulations with certain limited exceptions, skilled care service must be *provided* on a daily basis. 42 C.F.R. § 409.31(b). The state also must "provide for agreements with every person or institution providing services under the State plan under which such person or institution agrees (A) to keep such records as are necessary fully to disclose the extent of the

services provided to individuals receiving assistance under the State plan." 42 U.S.C. § 1396a(a)(27). Clearly, the state requirement of daily documentation *on its face* comports with the federal statute. The state has been left wide discretion in implementation of Medicaid programs and it cannot be said that this requirement is arbitrary or capricious.[9] There is no substantial likelihood of success on this claim.

(d) The public interest.

The public has an interest both ways in this litigation. Certainly the public has an interest in seeing to it that the elderly are receiving adequate health care and that state regulations comply with federal requirements. The public, however, also has an interest in seeing that tax dollars are being spent reasonably and that nursing care facilities do not receive reimbursement for skilled care treatment to which the facilities are not entitled under federal regulations. The public interest factor does not tilt favorably either way.

B. Pennsylvania's reimbursement plan as insufficient in duration and scope to effectuate the Medicaid plan.

Plaintiffs' second contention in support of a preliminary injunction is that the state's methods of calculating reimbursable costs for skilled and intermediate care facilities are inadequate to effectuate the plan's purpose, in violation of federal law. Specifically, the plaintiffs focus on the figure chosen by the state as the maximum average number of hours allowable for nursing care for both the skilled and intermediate levels. A brief review of the method used by Pennsylvania to calculate reimbursable costs is in order.

The State of Pennsylvania allows nursing homes to be reimbursed for certain allowable actual costs, except nursing, up to an allowable ceiling. The allowable

nursing costs are determined by referencing the Pennsylvania Department of Health's minimum licensing requirements. DPW took the state Department of Health standards of average hours of nursing care per patient and then added in some leeway because those standards were the minimum. The Department of Health's minimum licensing figures are 2.0 hours for intermediate care and 2.5 hours for skilled care. DPW uses 2.4 hours for intermediate and 3.0 hours for skilled care as allowable figures for reimbursement of nursing costs.

The ceiling is imposed to encourage nursing homes to be cost efficient. The ceiling is determined by taking the cost reports of all the nursing homes and breaking them down into like groups. First, skilled and intermediate facilities are separated and then private homes, county homes and hospital-based homes are separated. The private homes are further subdivided into profit and non-profit homes. The total per diem unaudited costs of each home in each group is then computed for all patients (medical assistance as well as private). The homes are then arranged from highest cost per day to lowest and the median or midpoint is determined. To that figure is then added inflation factors based on the consumer price index to account for both past and future inflation. The resulting figure is the ceiling. A nursing home is not reimbursed for any amount in excess of the ceiling.

Plaintiffs essentially object to DPW's method of calculating reimbursement rates on two grounds: (1) the use of the Department of Health's minimum licensing requirements as a basis for DPW's allowable cost reimbursement for nursing hours, and (2) the use of a ceiling in general and the selection of the median as a starting point in particular.

---

**9.** Plaintiffs presented evidence at the hearing that, as it is being applied, the daily documentation requirement is being abused. There are charges that the Inspection of Care teams of DPW require things to be documented which normally doctors and nurses understand are being performed without daily notations in the patient's record. Regardless of whether the documentation requirement is sound medical practice, this is an *as applied* argument. As stated earlier the class was only certified to challenge the regulations on their face. On their face, the regulations comply with federal law.

Prior to 1972, there was no guidance in the Medicaid statute as to how reimbursement rates for nursing care facilities participating in the program should be set. In 1972, Congress enacted a "reasonable cost related basis" as a standard for reviewing the states' method of setting rates. *See* 42 U.S.C. § 1396a(a)(13)(E) (1974) (as amended). This standard was "intended to give states the flexibility to experiment with various reimbursement methodologies." *Coalition of Michigan Nursing Homes v. Dempsey,* 537 F.Supp. 451, 455 (E.D.Mich. 1982).

In 1980 and 1981, Congress replaced the "reasonable cost-related" standard with the present standard.[10] The present standard provides for payment through the use of rates which are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and service in conformity with state and federal laws, regulations, and quality and safety standards. *See* 42 U.S.C. § 1396a(a)(13)(A).

There have been at least two recent decisions involving challenges to state reimbursement plans of nursing homes under section 1396a(a)(13)(A). *See In re Park Nursing Center, Inc.,* 28 B.R. 793 (Bkrtcy. E.D.Mich.1983); *Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451 (E.D.Mich.1982). A third challenge relating to section 1396a(a)(13)(A) involved a reimbursement plan to hospitals for in-patient services to Medicaid patients. *See Mississippi Hospital Ass'n, Inc. v. Heckler,* 701 F.2d 511 (5th Cir.1983). In all three cases the state plans were upheld.

In all three decisions the courts recognized the wide discretion Congress left to the states regarding reimbursement. In *In re Park Nursing Center, Inc.,* for example, the court noted that "[t]he Sixth Circuit recognized the flexibility that the states possess in selecting reasonable cost related reimbursement rates in *In re Made-line Marie Nursing Homes,* 694 F.2d 433 (6th Cir.1982)." 28 B.R. at 802. Further, under the Medicaid Act as interpreted by the Sixth Circuit, "the state is not required to reimburse a provider for its actual and allowable costs. Federal law merely requires that payments be made on a reasonable cost related basis established by the state plan, even where the method used results in underpayment to some providers." *Id.* at 803 (citations omitted).[11]

In light of the applicable standards, it is my present opinion that the Pennsylvania regulations are not arbitrary or capricious. As such, plaintiffs' likelihood of success on the merits on this issue is not great. The application for a preliminary injunction based upon challenges to the Pennsylvania reimbursement method will be denied.

The plaintiffs also challenge DPW's utilization of the Department of Health's licensing standards for determining reimbursable nursing hours. This standard appears to be neither arbitrary nor capricious. The Department of Health has implemented regulations requiring nursing homes to provide a certain minimum number of nursing hours per patient in order for nursing homes to qualify for licensing. The minimum is 2.5 hours per day per patient for skilled care and 2 hours for intermediate care. DPW took these figures, added some leeway (about 20%) and determined that 2.4 hours for intermediate care and 3.0 hours for skilled care would be the allowable reimbursable hours for nursing care effective January 1, 1984. While this may not be the best or only method for determining reimbursable nursing services, it has certainly not been selected in an arbitrary and capricious manner.

Likewise, the plaintiffs' challenge to the method of computing the maximum ceiling is not convincing. Plaintiffs apparently challenge DPW's use of the median or 50th percentile as arbitrary and capricious.

10. *See supra* p. 592 for the text of the new standard.

11. I am, of course, aware that the decisions of the Sixth Circuit are not binding in this circuit.

However, the Third Circuit has not had occasion, to my knowledge, to address the specific issue involved. I have, therefore, looked to analogous decisions in other circuits.

While there was no substantial testimony as to why this point was selected, the plaintiffs bear the burden of persuasion on this point. *Dempsey,* 537 F.Supp. at 462–63. There was testimony presented, however, that while the 50th percentile was used as a starting point, because of the use of unaudited cost reports and inflation factors, 70 percent of the nursing homes came in under the ceiling, which has the effect of the homes being fully reimbursed for the allowable number of nursing hours per patient. Only 30 percent were at or above the ceiling. Considering all the circumstances, a ceiling which *effectively* operates at the 70th percentile is neither arbitrary nor capricious. *See Mississippi Hospital Ass'n, Inc.,* 701 F.2d at 517 (80th percentile for in-patient hospital care not arbitrary or capricious); *Dempsey,* 537 F.Supp. at 453 (80th percentile ceiling for variable costs of nursing homes not arbitrary or capricious).

I have only addressed the likelihood of success on the merits as to plaintiffs' claim that the formula for calculating reimbursable nursing hours is invalid, because determination of the other three criteria to be considered on an application for a preliminary injunction are essentially the same as those discussed in relation to plaintiffs' claims that state regulations are inconsistent with federal regulations. In short, there is no showing of irreparable harm. There may be harm to defendants if the preliminary relief is improvidently granted and the public interest does not weigh heavily either way.

### VII. *Conclusion*

Plaintiffs' request for a preliminary injunction will be denied. The application will be denied as to plaintiffs' contention that the state regulations conflict with the federal regulations. Although plaintiffs may ultimately succeed on the merits on this contention, the other equities weigh in favor of denial at this time. With respect to plaintiffs' contention that Pennsylvania's reimbursement method is deficient, the application will also be denied because there is no substantial likelihood of success on the merits and none of the other equitable considerations weigh in plaintiffs' favor.

Finally, to paraphrase the *In re Park Nursing Center, Inc.* court: It is not the function of this court to attempt to determine whether a given state welfare policy is wise or the best solution. Rather, where as here, there is an application for a preliminary injunction, the court's only function is to apply the relevant standards to the facts at hand and determine if the injunction should be granted. I have determined no preliminary injunction should issue.